Mark NICHOLSON d/b/a Nicholson Realty Co. *v.*
SIMMONS FIRST NATIONAL CORP., d/b/a Simmons
First National Bank

92-464                                    849 S.W.2d 483

Supreme Court of Arkansas
Opinion delivered March 15, 1993
[Rehearing denied April 19, 1993.*]

*Holt, C.J., and Brown, J., would grant rehearing.

*Mike Everett*, for appellant.

*Friday, Eldredge & Clark*, by: *Jerry L. Malone*, for appellee.

TOM GLAZE, Justice. Appellant Mark Nicholson is an Arkansas licensed real estate broker who brought this suit, alleging fraud, intentional interference with a contractual relationship and breach of contract on the part of Simmons First National Bank (Bank) in Pine Bluff. Nicholson's suit is premised upon a non-exclusive listing contract he entered into with Public Enterprises Corporation (PEC) whereby he agreed to procure

buyers for the purchase of a thirty-seven hundred acre farm named Yellow Bayou Plantation in Chicot County. Nicholson subsequently learned the Bank had the major or real interest in the farm, and asserted that, because of numerous misrepresentations made by the Bank's officers, Howell Davis and Craig Hunt, Nicholson eventually lost his fee under the aforementioned listing contract. After Nicholson had presented his evidence at trial, the Bank moved for a directed verdict on the three counts, at which time Nicholson voluntarily withdrew his breach of contract claim. The circuit judge directed a verdict in favor of the Bank on the remaining claims of fraud and intentional interference, from which Nicholson brings this appeal. Our review entails determining whether Nicholson's proof was so insubstantial as to require a jury verdict, if entered in his behalf, to be set aside. See Williams v. Smart Chevrolet Co., 292 Ark. 376, 730 S.W.2d 479 (1987). In reviewing a directed verdict that has been granted, we view the evidence that is most favorable to the party against whom the verdict was granted and give it its highest probative value, taking into account all reasonable inferences deducible from it. Id.

We first describe the title and mortgage history of the farm which is the focus of the transaction involved in this litigation. Before and at the time the parties in this case became interested in Yellow Bayou Plantation, the property had been owned by a Jerry Winemiller under his corporation, Yellow Bayou Plantation, Inc. Winemiller had one mortgage on the plantation in the amount of $2.7 million. The Federal Land Bank held that mortgage. Winemiller later obtained a second loan in the amount of $2 million from the Bank, and the Bank took a second mortgage on the farm to secure its loan.

In 1985, Winemiller contacted the Bank through its officer, Hunt, and informed the Bank that Yellow Bayou Plantation, Inc. was about to go bankrupt. In an effort to avoid the property becoming entangled in bankruptcy proceedings, the Bank suggested that Winemiller transfer title of the farm out of Winemiller's corporation; however, because the farm was ladened with the two mortgages, the Band was unable to take title to the property because the indebtedness was in excess of the Bank's legal landing limits. Thus, in an effort to place title to the farm in a reliable third party, the Bank got one of its attorneys, Harley Cox, to agree to take title in the name of his corporation, PEC, and in

October of 1985, title was so transferred. At this time, Federal Land Bank was about to foreclose on its first mortgage, and the Bank successfully induced FirstSouth F. A. to acquire the federal loan to avoid the foreclosure. This was the state of the title and mortgage history when this farm went on the market for sale and Nicholson first became involved. We now review the evidence necessary to determine whether it is sufficient to support Nicholson's fraud and intentional interference tort claims against the Bank.

Through a friend, Joey Hill, Nicholson and his father learned that two investors, David Stokes and Paul Piper, might be interested in buying the Yellow Bayou Plantation, and this led Nicholson to contact Bill Bridgforth, a Pine Bluff attorney, who prepared a listing contract naming PEC by E. Harley Cox, Jr., President, as the owner of the farm. Bridgforth and Cox were partners in the same law firm, and Cox was also attorney for the Bank. The contract initially provided a listing price of $4.5 million and an agent's fee of ten percent if the farm was "sold or otherwise disposed of" by Nicholson or any other person, including the owner, during the listing period.

After the listing contract was signed on November 22, 1985, Bridgforth introduced Nicholson to Bank officers Davis and Hunt, who informed Nicholson that PEC was "a friendly corporation that the Bank owned" and that the Bank held its acquired properties in that corporation. Davis and Hunt told Nicholson to work only with them concerning the sale of the plantation and that he would receive his commission from the Bank. Davis, Hunt and Nicholson then negotiated an amended listing contract reducing the sale price to $4 million and a fee of five, rather than ten, percent. Bridgforth prepared the amended contract, and it was signed by Chris Coker, who was authorized to sign for PEC in Cox's stead.

Stokes and Piper later submitted an offer dated December 17, 1985, naming the Bank as seller; they offered to buy the farm for "$4 million contingent upon Yellow Bayou Corporation having a $1.2 million tax loss available and assumable." Stokes and Piper paid $200,000 earnest money to the Bank on December 19, 1985, which Hunt accepted in the Bank's behalf. Nicholson testified that, when these transactions took place, Hunt said, "We

have a deal." Nevertheless, both Bridgforth and Hunt told Nicholson that the offer and acceptance could not be signed at that time because such an action would jeopardize the tax credits. Because no one knew whether the tax advantages sought by Stokes and Piper were available, the Bank contacted its tax attorney, Patrick Burrows, for guidance. On January 9, 1986, Burrows wrote Piper the following:

> Dear Mr. Piper:
>
> Our client, Simmons First National Bank, and the present and proposed stockholders of Yellow Bayou Plantation, Inc. offer for sale to you 100 % of the outstanding stock of Yellow Bayou Corporation for the sum of $4,000,000 cash . . . it appears that the net operating loss carry-forward of the corporation at its fiscal year end, March 31, 1986, will approximate $1,200,000.

On January 20, 1986, Piper's attorney rejected the proposal set forth in Burrows' January 9 letter. The Bank then refunded Stokes and Piper their earnest money.

Nicholson said that he learned the offer had gone sour, and that Davis and Hunt directed both Nicholson and Hill not to talk to Stokes or Piper thereafter. Davis and Hunt purportedly said that they would not sell the farm to Piper. Nicholson's listing contract expired on January 22, 1986.

Between January 28 and February 6, 1986, Hunt contacted Mr. Piper concerning whether any of the several foundations controlled by Piper would be interested in investing in the first mortgage held by FirstSouth on the farm in order to give the Bank more time to liquidate the property. Hunt further stated that it was the Bank's hope that the property could sell for enough money to pay off the first mortgage and still realize something on the Bank's second mortgage. Hunt explained that the Bank was attempting to get the most money it could out of the deal and to cut its losses.

Hunt's contact resulted in the Bank and Piper, on February 6, 1986, closing a transaction whereby (1) Piper purchased the first mortgage held by FirstSouth for $2.7 million, for which Piper would receive 12 % interest, and (2) Piper granted a one-year option to the Bank to purchase the $2.7 million first

mortgage. The option also included an agreement for the Bank to release its second mortgage if it failed to purchase Piper's first mortgage. Mr. Piper testified that the transaction was conceived by Harley Cox, who prepared the documents for the Bank and Piper. Subsequently, the Bank entered into other listing contracts to sell the property, but no sale occurred and no potential purchaser was located.

The Bank failed to make any payments on Piper's note, and on February 16, 1987, Pipe called the note. On February 24, 1987, in an attempt to bypass lengthy and costly foreclosure proceedings, Cox as president of PEC, conveyed title to the farm to Piper by executing a "Deed in Lieu of Foreclosure." Pursuant to their agreement, the Bank then released its second mortgage to Piper. Nicholson never received any contractual "Agent's Fee."

■ We now address Nicholson's fraud claim against the Bank, and in doing so, are mindful that fraud is never presumed but must be affirmatively proven by one alleging it by testimony which is clear and convincing. *Interstate Freeway Serv., Inc.* v. *Houser*, 310 Ark. 302, 835 S.W.2d 872 (1992). To prove fraud or the tort of deceit, Nicholson was required to show (1) a false representation of a material fact, (2) knowledge or belief on the part of the person making the representation that the representation is false, (3) an intent to induce the other party to act or refrain from acting in reliance on the misrepresentation, (4) a justifiable reliance on the misrepresentation, and (5) resulting damage. *Morris* v. *Valley Forge Insurance*, 305 Ark. 25, 805 S.W.2d 948 (1991).

■ The trial court found that Nicholson failed to show any of the misrepresentations made by the Bank were material. Nicholson claims that Bank officers Davis and Hunt misrepresented that (1) the Bank owned PEC and its acquired property, (2) the Bank was "the boss" and Nicholson would be working for the Bank, (3) Nicholson would receive his commission or fee from the Bank and (4) although Hunt knew better, Hunt never informed Nicholson that the Bank was not the seller. The trial court held that, assuming these claimed misrepresentations were true, none of them affected Nicholson's decision to procure a buyer under the terms of the parties' listing contract. Indisputably, Nicholson already had Stokes and Piper as potential pur-

chasers and had executed a listing contract on the thirty-seven hundred acre farm with PEC *before* Hunt and Davis made any of the aforementioned misrepresentations. Nicholson failed to show how the officers' misrepresentations prevented him from finding a buyer for the farm or how such statements may have affected the only offer made, which was the $4 million plus $1.2 million tax credit contingency offer from Piper. Mr. Piper, who was called as a witness for Nicholson, testified that he simply was not willing to pay "a straight four million dollars for that property."

The trial court also discounted the materiality of any of the Bank's misrepresentations by pointing out that the Bank made every effort to meet Piper's contingency offer by their attorney's January 9 letter proposing an alternative whereby Piper would purchase Yellow Bayou Plantation Corporation. The trial court noted that it was the Bank's benefit for the deal with Stokes and Piper to be consummated because the $2.7 million first mortgage on the farm was never in jeopardy of being satisfied; however, the second mortgage, held by the Bank, would not be fully satisfied, but the Bank could at least cut some of its losses if the deal with Piper was consummated. Again, Nicholson offered no proof on how Hunt's and Davis's false statements in any way impaired his contract rights or decisions in this matter.

Although the trial court's decision was premised on the materiality issue discussed above, we also believe Nicholson failed to show the claimed misrepresentations caused his damage. The parties' listing contract provided that Nicholson would be paid a fee if the property was sold or "otherwise disposed of by the owner," after the expiration or termination of the listing period when such a disposition of the property resulted from information obtained from Nicholson. While the property was never sold, the farm was clearly "otherwise disposed of" when PEC eventually deeded the property to Piper. Under the terms of the listing contract, Nicholson was entitled to a fee. While he initially filed suit against Cox, PEC, Hunt and Davis alleging breach of contract and fraud, Nicholson dismissed those claims and limited his actions to the torts of fraud and intentional interference against the Bank. While Nicholson now claims it dismissed the breach of contract claim because PEC and Cox were "turnips," the record simply fails to support such an assertion. In sum, Nicholson had contractual claims for his fee and failed to pursue

them, but, most important here, he again has failed to show that any of the Bank's misrepresentations caused him to lose either his commission or his cause of action to obtain it from the parties responsible under the listing contract.

■ In his second argument, Nicholson argues the Bank intentionally interfered with his contractual relationship. The elements necessary to prove such an action are as follows: (1) existence of a valid contractual relationship; (2) knowledge of that relationship or business expectancy on the part of the interferer; (3) intentional interference causing breach or termination of the relationship or expectancy; and (4) resulting damage to the party whose relationship or expectancy was disrupted. *Stebbins and Roberts, Inc.* v. *Halsey*, 265 Ark. 903, 582 S.W.2d 266 (1979); *Navorro-Monzo* v. *Hughes*, 297 Ark. 444, 763 S.W.2d 635 (1989).

In *Navorro-Monzo* this court stated:

> . . . a successful claim for interference with a contractual relation must allege and prove that a third party either did not enter into or failed to continue with claimant as a result of the unauthorized conduct of the defendant . . .

297 Ark. at 447, 763 S.W.2d at 636.

Nicholson contends the Bank interfered with his contractual relationship in the following two respects: (1) when the Bank's attorney, Burrows, wrote Piper on January 9, 1986, without informing Nicholson, that the "tax loss contingency" part of Piper's offer could not be met solely through the conveyance of the farm property, but could only be realized by Piper's purchasing the stock of Yellow Bayou Plantation Corporation; and (2) when the Bank contacted Piper after the listing agreement expired to request that Piper purchase FirstSouth's first mortgage and in obtaining a one-year option to buy the first mortgage.

■ The answer to Nicholson's first contention under this point is found in our earlier discussion pertaining to the clear purpose of Burrow's January 9 letter to Piper. The evidence is uncontradicted that the Bank's tax attorneys were attempting to meet Piper's contingency offer by proposing Piper buy the stock of Yellow Bayou Plantation Corporation. The Bank's action in this respect was made "in furtherance" of the terms of the parties'

listing contract, not "in interference" with them. If Piper had accepted the proposal, the farm would have been reconveyed by PEC to the corporation and such a sale and disposition of the property would have entitled Nicholson to his fee under the listing contract.

Nicholson's second contention focuses on the Bank's contact of Piper after the listing contract expired and its officers' directive that Nicholson and Hill should not talk to Piper or Stokes. Once again, we mention that, irrespective of Hunt's or Davis's false statements, Nicholson's agreement with PEC was still in effect even after the listing period expired. As we discussed in Nicholson's fraud claim, Nicholson was entitled to a commission even after the listing period expired if the property was "otherwise disposed of" by the owner when such disposition resulted from information obtained through Nicholson. The Bank gained knowledge of Piper through Nicholson, and while no sale was ever made to Piper and Stokes, PEC eventually transferred title of the farm to Piper when the Bank's efforts to sell the property fell through. The disposition of the property to Piper triggered Nicholson's rights under the contract, making Nicholson entitled to a fee. Obviously, if Nicholson was entitled to his contractual commission then it follows that no intentional interference with his contract rights existed. Put simply, Nicholson failed to show PEC breached their contract by refusing to pay any fee or commission, much less that the Bank's interference caused Nicholson to lose such fee expectancy under the PEC/Nicholson contract. As a consequence, Nicholson failed to meet both the elements (3) and (4) in his attempt to prove tortious interference with a contractual relation.

The trial judge did not err in granting the Bank's motion for directed verdict and we affirm.

HOLT, C.J., NEWBERN and BROWN, JJ., dissent.

ROBERT L. BROWN, Justice, dissenting. This case should have gone to the jury. Instead, the trial court directed a verdict in favor of Simmons First National Bank at the close of all the evidence.

Our task on appeal is to review all of the evidence in the light most favorable to Mark Nicholson and determine whether any substantial evidence of fraud or tortious interference exists. *Bank of Malvern v. Dunklin*, 307 Ark. 127, 817 S.W.2d 873 (1991). In looking at the case from Nicholson's perspective and addressing

the proof on his behalf, he presents a viable case of tortious interference.

The case presented by Nicholson was this. Simmons Bank held a $2 million second mortgage on the Yellow Bayou Plantation and was advised that the corporate owner of the plantation was on the verge of bankruptcy. To avoid bankruptcy, the bank suggested that the property be transferred out of the corporation. The bank could not take title to the property because the total debt would exceed the bank's legal lending limits relative to this property. The property was, as a consequence, transferred to a friendly corporation, PEC, which was owned by the bank's attorney, Harley Cox. PEC was the alter-ego of the bank, and PEC acted to accommodate the bank and at the bank's behest. With respect to this property, the two entities were acting on concert.

Nicholson then entered into a real estate contract with PEC to sell the plantation for $4 million at a commission of five percent. Nicholson brought Piper and Stokes to the table as buyers on December 17, 1985, with an offer of $4 million and an earnest money payment of $200,000, and a tax write-off of $1,250,000 as a contingency. The agreement prepared by Nicholson showed the bank as the owner of the plantation.

After that point, Nicholson was effectively cut out of the deal. Another bank attorney, Pat Burrows, wrote a letter directly to Piper on January 9, 1986, in an attempt to restructure the deal as a stock sale by the owning corporation so that Piper could take advantage of a loss carryforward of $1,200,000. No mention of either PEC or Nicholson was made in the letter. After receiving the letter, Piper wrote back, through his attorney, on January 20, 1986, and requested that his earnest money be returned because, as he put it, "the plantation cannot be sold as previously discussed with the bank." At that point the deal was terminated. The bank's officers directed Nicholson not to have further contact with Piper. Mark Nicholson testified:

> [The bank officers] told us that the deal was off, and they told us not to go talk to the Pipers and the Stokes. They said that they were tired of running around after them, and they said they wouldn't do a deal with them if they came back and offered them $4 million cash.

Larry Nicholson, the appellant's father, testified in a similar vein:

> [The bank officers] told us don't be fooling with Paul Piper and them, that they weren't going to sell them the farm. At that time, they told us that the deal was off with them. They told us that they wouldn't be dealing with Paul Piper or David Stokes, but they were dealing with them all the time. They didn't tell us that. They said they weren't dealing with Nicholson Realty Company's clients, but they were. They said that we shouldn't deal with them, that they wouldn't sell it to Paul Piper if he had golden gloves or something to that nature.

Nicholson's listing agreement with PEC terminated on January 22, 1986.

The bank then continued to pursue its own deal with Piper. Piper himself testified that he was doing business only with the bank at this point. On February 6, 1986, just two weeks after Nicholson's contract with the PEC expired, the bank contracted with Piper for Piper to purchase the first mortgage from First South in the amount of $2.7 million and gave the bank an option to purchase the first mortgage within one year. The bank then listed the property with several real estate brokers. No contact was had with Nicholson in the effort, and no sale was forthcoming. The bank failed to make any payments on the note now owned by Piper. Piper called the loan, and on February 24, 1987, PEC deeded the property to Piper. The bank simultaneously released its second mortgage on the land, the net result being that Piper took the property free and clear.

Nicholson received no commission on the deed to Piper.

The trial court concluded that the deal between PEC and Piper could never have been consummated as originally envisioned because it was contingent on a tax write-off which Nicholson's offer on behalf of Piper did not provide. The court also alluded to the fact that the property was ultimately disposed of to Piper, the intimation being that this entitled Nicholson to a commission under the original listing agreement from PEC. This transfer to Piper, however, occurred more than a year after Nicholson's contract with PEC had expired and after the bank had structured a new deal with Piper and after Nicholson had been told by the bank to cease communication with Piper.

In sum, Nicholson was told by the bank not to contact Piper and that the deal was off. The bank then entered into a separate

agreement with Piper, unbeknownst to Nicholson, and listed the property with other real estate agencies. Nicholson, thus, was severely limited in further negotiating a sale with Piper. Nicholson may also have had a cause of action in contract against PEC, but I am not prepared to say, as a matter of law, that the bank did not interfere with his business expectancy and that he was not damaged by the bank's actions.

Viewing this case in the light most favorable to Nicholson a cause of action exists and the jury should have decided the matter. I respectfully dissent.

HOLT C.J., and NEWBERN, J., join.