John M. MASON *v.* WAL-MART STORES, INC.

96-1351                                         969 S.W.2d 160

Supreme Court of Arkansas
Opinion delivered April 30, 1998
[Petition for rehearing denied May 28, 1998.*]

---

* Arnold, C.J., and Glaze, J., would grant. Corbin, J., not participating.

*Slaon, Rubens & Peeples*, by: *Kent J. Rubens*; *Glover & Glover*, by: *Mac Glover*; and *Timothy O. Dudley*, for appelant.

*Williams & Anderson*, by: *Peter G. Kumpe, Leon Holmes*, and *Katherine R. Cloud*, for appellees.

DAVID NEWBERN, Justice. John M. Mason appeals from a summary judgment awarded to Wal-Mart Stores, Inc. ("Wal-Mart"), on Mr. Mason's claim for tortious interference with a contractual relationship and business expectancy. We affirm the

judgment because the evidence presented by Mr. Mason did not demonstrate that Wal-Mart's conduct was improper.

Mr. Mason worked as an independent sales representative for three vendors who sold products to Wal-Mart for resale. Century Products Company ("Century"), Okla Homer Smith Furniture Manufacturing Company ("Okla Homer"), and Pentech International, Inc. ("Pentech"), each had an account with Wal-Mart, and Mr. Mason, on a purely at-will basis, served as their sales representative to Wal-Mart.

For more than a decade, Wal-Mart exhibited discontent with dealing with independent manufacturers' representatives like Mr. Mason. On November 6, 1991, David Glass, Wal-Mart president and CEO, issued a letter to some, if not all, of its vendors expressing Wal-Mart's preference for dealing directly with "principals" of the vendors.

The letter, which was reported in a major article in *The Wall Street Journal*, mentioned the rapid growth of Wal-Mart and the desirability on the part of Wal-Mart and its suppliers to be able to forecast each other's needs and to react quickly. It mentioned new computer systems by which Wal-Mart shared information with its vendors, and it referred to the extra reaction time created by dealing through a third party in addition to the "high risk of misunderstandings" inherent in the system using independent representatives.

The letter defined a "principal" as "an employee of your company empowered to make decisions and act in your behalf." Excluded were individuals claiming "to be a 'principal' of one or more other companies." The letter concluded by stating that the vendor would be "contacted" later to learn whether it agreed to accept Wal-Mart's "decision that it is in the best interest of our company and our customers to deal directly with the principals of your company."

Shortly after Wal-Mart issued that letter, Century, Okla Homer Smith, and Pentech removed Mr. Mason from their Wal-Mart accounts, and Century and Pentech hired new persons to handle the Wal-Mart account "in house." Mr. Smith at Okla

Homer dealt with Wal-Mart himself, as he said he had always done, even while Mr. Mason was working for him. Mr. Mason was not terminated by Century; rather, he was kept on there, but he dealt with other accounts. He was terminated by Pentech because his only role there had been to assist on the Wal-Mart account. Mr. Mason ultimately ceased working for all three vendors.

Mr. Mason sued Wal-Mart, alleging that he had a contract with Century and Okla Homer to act as their representative to Wal-Mart. Those contracts, he alleged, were in effect from July 1967 through the early part of 1992. He also alleged that he had a contract with Pentech from August 1980 to December 1991. Mr. Mason alleged that he was paid a commission by those vendors on the sales of their products to Wal-Mart and that, in light of his highly regarded performance, his contractual relationships could reasonably have been expected to continue.

The interference with his contractual relationships and business expectancies was described as Wal-Mart's use of its economic power to coerce Mr. Mason's employers to terminate his contracts with them. The complaint referred to Mr. Glass's letter and mentioned an incident that allegedly occurred in 1982 when a Wal-Mart employee asked Century to terminate its relationship with Mr. Mason and pass on to Wal-Mart any savings thus achieved.

In its motion for summary judgment, Wal-Mart asserted that "the undisputed facts demonstrate that Wal-Mart did not improperly interfere with Mason's contractual relationships and did not induce Century, Okla Homer Smith or Pentech to breach any contract with Mason. Moreover, Wal-Mart's conduct was privileged."

The Trial Court granted Wal-Mart's motion, holding that Mr. Mason "cannot present proof of improper interference as required in an intentional interference with a contractual relationship claim" and that, "when a party cannot present proof on an essential element of its claim, there is no remaining genuine issue of material fact thereby entitling the party moving for summary judgment to a judgment as a matter of law." The Trial Court said

that an interference in a contractual relationship must be "improper" in order to be "actionable."

The Trial Court relied on factors listed in the RESTATEMENT (SECOND) OF TORTS § 767, and on *Conoco Inc. v. Inman Oil Co., Inc.*, 774 F.2d 895 (8th Cir. 1985), an opinion discussing § 767, to determine whether Wal-Mart's actions could be viewed as "improper interference." The Trial Court conceded that "economic pressure can constitute improper conduct," but it said that Wal-Mart's conduct did "not amount to improper, actionable conduct under the elements required for an intentional interference with a contractual relationship claim." The Trial Court said that "competitive conduct which is neither illegal nor independently actionable does not become actionable because it interferes with another's contractual relations," citing *Amerinet, Inc. v. Xerox Corp.*, 972 F.2d 1483, 1507 (8th Cir. 1992).

The Trial Court addressed the alleged 1982 incident, saying that, even if testimony about that conversation could be admitted at trial, it was "insufficient to establish a prima facie case of improper conduct on the part of Wal-Mart." Thus, the Trial Court concluded that Mr. Mason could not "establish a prima facie case of intentional interference with a contractual relationship claim against Wal-Mart." Wal-Mart's privilege claim was not addressed.

Mr. Mason argues first that the Trial Court "improperly imposed an element of proof on Mason which the law does not require"—namely, the requirement to prove that the alleged interference by the defendant was "improper" or "wrongful." Secondly, he contends that, even if impropriety or wrongfulness *is* an element of his claim, summary judgment was inappropriate because he adduced sufficient evidence of improper or wrongful conduct on Wal-Mart's part to create a genuine issue of material fact. Ark. R. Civ. P. 56(c).

### 1.    The "impropriety" requirement

To understand our conclusion that it is necessary for the plaintiff in an interference-with-contract claim to demonstrate that the conduct of the defendant was at least improper, it is help-

ful to consider the tort's modern history in the law of this State. It begins with *Mason v. Funderburk*, 247 Ark. 521, 446 S.W.2d 543 (1969), in which a sales manager for a company selling books to schools alleged that members and administrators of a school board wrongfully caused him to lose his job by defaming him. Obviously, the defamatory conduct alleged was tortious in itself. We reversed a summary judgment that had been awarded against some of the defendants. In the course of the opinion, we referred to the misconduct alleged as malicious, wilful, without legal justification, without privilege, and tortious. Thus, we clearly contemplated that a plaintiff alleging interference with a contract establish that the defendant did something wrongful or improper. In *Elliott v. Elliott*, 252 Ark. 966, 482 S.W.2d 123 (1972), we affirmed a directed verdict with respect to a claim of interference with a land-sale contract, citing the *Mason* case and pointing out that the interference was required to be with malice.

In *Stebbins & Roberts, Inc. v. Halsey*, 265 Ark. 903, 582 S.W.2d 266 (1979), we adopted a new approach. Mr. Halsey had been a paint salesman for Stebbins & Roberts, Inc. ("Stebbins"). He took a similar position with PPG Company. It was alleged that, despite a covenant in his contract with Stebbins not to compete for one year, he began calling on his former Stebbins customers. A Stebbins employee called PPG, informed it of the anti-competition agreement, and announced he planned to sue Mr. Halsey, make an example of him, and "name" PPG in the process. Mr. Halsey was fired by PPG, so he sued Stebbins for interference with his contract. In holding that Stebbins was not entitled to a directed verdict, we adopted the view expressed in PROSSER ON TORTS (4th ed. 1971), that, once Mr. Halsey had shown a "wrongful" interference with his contract, Stebbins would be required to show that its conduct was "privileged," thus shifting to the defendant the burden of going forward with the evidence.

In the case of *Walt Bennett Ford, Inc. v. Pulaski Co. Spec. Sch. Dist.*, 274 Ark. 208, 624 S.W.2d 426 (1981), Walt Bennett Ford ("Bennett") and the Jim Nabors Company ("Nabors") each bid on school buses to be purchased by the school district. Nabors prevailed, and Bennett sued members of the school board, claiming they had "maliciously and willfully interfered" with its busi-

ness expectancy. We held that, by awarding the contract to the low bidder, Nabors, the school board members had protected the tax payers' interest and had not acted in bad faith. In a supplemental opinion denying rehearing, we wrote:

> The general rule is that an improper motive or bad faith is no longer an essential part of the plaintiff's case in the tort of interference with existing contractual relations. However, the defendant may show that his interference was privileged. *Stebbins & Roberts, Inc. v. Halsey*, 265 Ark. 903, 582 S.W.2d 266 (1979) . . . . Our rule announced in *Stebbins*, supra, that bad faith is no longer an essential part of the plaintiff's case in the tort of interference with contractual relations is in no manner modified or varied by our original opinion.

*Id.* at 214A–214B, 624 S.W.2d at 429–30.

Our opinions in the *Walt Bennett Ford* case are cited in connection with a discussion in PROSSER AND KEETON ON TORTS § 129, at pp. 983–84 and n. 61 and 62 (5th ed. 1984). Unlike the 1971 version of the Prosser text, the later edition states:

> It has always been agreed that a defendant might intentionally interfere with the plaintiff's interests without liability if there were good grounds for the interference, or in other words that some kind of unacceptable purpose was required in addition to the intent. Different formulas to express this idea have been in use at different stages in the development of the tort, the first of which was to say that there was liability for intentional interference that was "malicious." It has long been clear, however, that "malice" in the sense of ill-will or spite is not required for liability. In recognition of this, courts and writers adopted a second formula under which liability was imposed for any intentional interference that resulted in harm. Under this formula, the plaintiff made out a prima facie case upon proof of intended interference plus damages, and it was left to the defendant to shoulder if he could the burden of proving he was justified in his actions, for example, by showing that he acted to protect legitimate and prior property or contract interests of his own. This formula subjected the defendant to liability without first describing to him what was forbidden and what was permitted, and it added to this injury by putting the burden upon him to justify his conduct without spec-

ifying in any precise way what would amount to such a justification. The Restatement Second of Torts has adopted a third formula, which may meet a part of this objection. *Under this, the defendant is subject to liability for a knowing or purposeful interference with contract only if the defendant's action was "improper," either as to means or purpose. This formula might be read, as some of the cases imply, to put the burden on the plaintiff in the first instance to show impropriety, and it is no doubt an improvement when so read. But the Second Restatement refused to take a clear position on the point and other cases have left the burden upon the defendant to justify his conduct.*

*Id.* at pp. 983–84 (emphasis supplied.)

Although our discussion in the *Walt Bennett Ford* opinion did not mention the Restatement's position, Prosser cites the case in connection with his assertion that "other cases have left the burden upon the defendant to justify his conduct." PROSSER, *supra,* p. 984 n.62. In describing the case, he points out that this Court "first held for defendants on the ground that there was no bad faith, then on supplemental opinion, reaffirmed its earlier rule that bad faith was no part of the plaintiff's case."

Some of our later cases have mentioned that "bad faith" is not a requirement, *see, e.g., L.L. Cole & Son Inc. v. Hickman,* 282 Ark. 6, 8–9, 665 S.W.2d 278, 280 (1984), and have stated the elements as we did in the *Walt Bennett Ford* case as follows:

(1) [T]he existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted.

274 Ark. at 214, 624 S.W.2d at 429. These elements are consistent with the ones found in *Arkansas Model Jury Instructions, Civil,* § 406 (Supp. 1995), in Chapter 4, entitled "Willful and Wanton Conduct, Outrage, and Deceit."

In *Kinco, Inc. v. Schueck Steel, Inc.,* 283 Ark. 72, 671 S.W.2d 178 (1984), however, we seemed to require a showing of improper conduct beyond the earlier-stated elements that now appear in

AMI 406. Schueck Steel, Inc. ("Schueck") was to furnish Walcon brand metal wall panels in the construction of a public school building for a set price, including a set profit, negotiated with the architects. Richardson Construction Co. was awarded the contract to erect the walls, and it subcontracted the work with Kinco, Inc. ("Kinco"). Kinco, without informing Schueck, became a distributor for another brand of wall panels, thus becoming Shueck's competitor, and used its knowledge of Shueck's prices to underbid Shueck. Schueck prevailed at trial, and Kinco contended on appeal that it should have had a directed verdict. We held that Shueck's evidence was sufficient to support the judgment. We recited the elements of the tort of interference with a business expectancy substantially as above, but in our discussion of whether the evidence was sufficient we did not limit ourselves to those elements, or even discuss them, but dwelt solely upon the evidence of Kinco's misconduct. We then moved on to the second point, which was Kinco's apparent contention that, even if the elements were proven, it was entitled to a directed verdict as its action was privileged because, as with the school directors in the *Walt Bennett Ford* case, Kinco was trying to protect the public interest. We rejected that argument, but we did so not on the basis of evaluating the asserted privilege; rather, we again discussed Kinco's misconduct, by enriching itself by "devious and improper means." 238 Ark. at 77, 671 S.W.2d at 1811.

In *United-Bilt Homes v. Sampson*, 310 Ark. 47, 51, 832 S.W.2d 502, 503 (1992), we seemingly reverted to defining the tort as imposing liability upon one "who intentionally and with malice interferes with the contractual relations with another." In addition, however, to citing the 1971 edition of PROSSER ON TORTS, we also cited the 1984 edition of PROSSER AND KEETON ON TORTS and mentioned the possibility of "justification" for the alleged tortfeasor's action. *See also Cross v. Arkansas Livestock & Poultry Comm'n*, 328 Ark. 255, 262, 943 S.W.2d 230, 234 (1997) (citing the *United-Bilt Homes* case for the statement the actor must act with "malice").

In *Fisher v. Jones*, 311 Ark. 450, 844 S.W.2d 954 (1993), the facts were that J.D. Fisher sold his Mercedes–Benz franchise to Kelly Hill and others. Mr. Hill contracted to sell the franchise to Gerald Jones. Mr. Hill's group owed Mercedes–Benz Credit Corp. ("MBCC") $600,000. MBCC seized the inventory of the dealership. Mr. Fisher claimed that MBCC had thus interfered in his right of first refusal to repurchase the franchise from Mr. Hill. In holding that a summary judgment in favor of MBCC was appropriate, we noted that Mr. Fisher had no contract giving him a right to repurchase the franchise and that MBCC had a right to protect its interest in the inventory. We stated:

> For an interference to be actionable, it must be improper. *Walt Bennett Ford v. Pulaski County Special Sch. Dist.* . . . (supplemental opinion on denial of rehearing). The *Restatement (Second) of Torts* sets out the factors in determining when interference is improper as follows:
>
> *Factors in Determining Whether Interference is Improper.*
>
> In determining whether an actor's conduct in intentionally interfering with a contract or a prospective contractual relation of another is improper or not, consideration is given to the following factors:
>
> (a) the nature of the actor's conduct;
>
> (b) the actor's motive;
>
> (c) the interests of the other with which the actor's conduct interferes;
>
> (d) the interests sought to be advanced by the actor;
>
> (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other;
>
> (f) the proximity or remoteness of the actor's conduct to the interference; and
>
> (g) the relations between the parties.

311 Ark. at 458-59, 844 S.W.2d at 959.

The reference to the supplemental opinion in the *Walt Bennett Ford* case is puzzling because it was in that opinion that we declared that "the general rule is that an improper motive or bad faith is no longer an essential part of the plaintiff's case in the tort of interference with existing contractual relations." Our holding there seemed to be that the conduct of the school board members was not actionable because it was privileged because it was done in good faith.

In *Hunt v. Riley*, 322 Ark. 453, 909 S.W.2d 329 (1995), we affirmed the dismissal of a complaint for failure to state facts upon which relief could be granted. Ark. R. Civ. P. 12(b)(6). As a deficiency in the complaint, we recited, "Nor does the complaint allege . . . that the defendants' actions were in any way improper." 322 Ark. at 459, 909 S.W.2d at 332.

If anything is clear from this recitation of our cases, it is that, in the *Stebbins & Roberts* case we adopted the 1971 Prosser procedure, later memorialized in AMI 406, in which a plaintiff who had shown certain elements could establish a claim for interference with a contract or business expectancy and that it then became incumbent upon the defendant to show that the interference was somehow privileged, without knowing what might constitute such a privilege. That is the procedure that Professor Dan B. Dobbs referred to as a "sorry state of affairs" in Dan B. Dobbs, *Tortious Interference with Contractual Relationships*, 34 Ark. L. Rev. 335, 345 (1980).

Just as our cases seem to have reverted to requiring an allegation, or, at the summary-judgment stage, a showing of "improper" conduct on the part of the defendant, the Restatement (Second) of Torts, § 766, now provides:

> One who intentionally *and improperly* interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract. [Emphasis supplied.]

Professor Dobbs considers this reversion to placing the burden on the plaintiff as an improvement, but he remains critical of the RESTATEMENT (SECOND) rule because of the indefiniteness of the term "improper." While we understand the sentiment that the tort should be reduced to situations in which a third party may be held liable for interference only when the alleged conduct is independently tortious as it was in *Mason v. Funderburk, supra*, we are unwilling to go that far. *Cf. Conoco, Inc. v. Inman Oil Col, Inc.*, 774 F.2d 895, 907 (8th Cir. 1985)("We think that 'wrongful means' in this context refers to means which are intrinsically wrongful — that is, conduct which is itself capable of forming the basis for liability of the actor.") Our review of our cases leads us to the position that, as RESTATEMENT § 766, our law requires that the conduct of the defendant be at least "improper," and we look to factors such as those stated in § 767 to determine whether the defendant's conduct fits that description.

### 2. Wal-Mart's conduct

Mr. Mason's argument does not end with the suggestion that the Trial Court erred in including the requirement that Wal-Mart be shown to have interfered improperly in his contracts or business expectancies. He argues that, even if that is a requirement, the evidence he presented shows that Wal-Mart's conduct was indeed improper. The only suggestion of impropriety, however, is that Wal-Mart's intention was to increase its profits by eliminating manufacturer's representatives from its purchasing process. When questioned about whether the economic ends sought to be furthered by Wal-Mart were improper, Mr. Mason's counsel referred to Comment c of the RESTATEMENT (SECOND) OF TORTS following § 767. It reads as follows:

> *Economic pressure.* Economic pressure of various types is a common means of inducing persons not to deal with another, as when A refuses to deal with B if B enters into or continues a relation with C, or when A increases his prices to B or induces D not to deal with B on the same condition. Or the pressure may consist of the refusal to admit B to membership into a trade asso-

ciation or a professional organization, as a medical or legal association. The question whether this pressure is proper is answered in the light of the circumstances in which it is exerted, the object sought to be accomplished by the actor, the degree of coercion involved, the extent of the harm that it threatens, the effect upon the neutral parties drawn into the situation, the effects upon competition, and the general reasonableness and appropriateness of this pressure as a means of accomplishing the actor's objective.

■ Although Mr. Mason uses the term "greed" to describe Wal-Mart's objective, the term "profit motive" could have been substituted. To hold that the evidence presented in this case requires that a jury evaluate Wal-Mart's conduct in accordance with the explanation contained in comment c to § 767 would require it in any instance when a business threatens not to buy in order to get a better price. In short, we see nothing in the evidence presented by Mr. Mason that we could consider to be indicative of improper conduct on the part of Wal-Mart.

Affirmed.

CORBIN, J., did not participate in the decision of this case.

Special Justice LYNN WILLIAMS joins in this opinion.

ARNOLD, C.J., and GLAZE, J., dissent.

## DISSENTING OPINION TO COURT'S DENIAL OF REHEARING

Opinion Delivered
May 28, 1998

TOM GLAZE, Justice, dissenting. As a caveat to the bench and bar, I point out that today's decision changes this court's AMI Civ. 3d Instructions 406 and 407. I think unnecessarily so; thus, I dissent.[1]

---

[1] This dissenting opinion was prepared to be handed down on April 30, 1998, when the majority court's decision was rendered with Chief Justice W. H. "Dub" Arnold and me

The mischief triggering this court's decision to overrule longstanding precedent is primarily due to our opinion in *Fisher v. Jones*, 311 Ark. 450, 844 S.W.2d 954 (1993), which misstates this court's holding in *Walt Bennett Ford v. Pul. Co. Spl. Sch. Dist.*, 274 Ark. 208, 214-A, 624 S.W.2d 426, 429 (1981) (Supplemental Opinion on Denial of Rehearing). In chronological order, those two holdings are as follows:

> "The general rule is that an *improper motive or bad faith is no longer an essential part of the plaintiff's case in the tort of interference with existing contractual relations.* However, the defendant may show his interference was privileged. *Stebbins & Roberts, Inc. v. Halsey*, 265 Ark. 903, 582 S.W.2d 266 (1979). 274 Ark. at 214-A, 624 S.W.2d at 419 (1981). (Emphasis added.)

> \*    \*    \*

> *For an interference* [with a contract relation] *to be actionable, it must be improper.* 311 Ark. at 458, 844 S.W.2d at 959 (1993). (Emphasis added.)

Obviously, the above two holdings are at odds. To confuse matters further, the court's opinion in *Fisher* not only misstated the rule firmly announced in *Walt Bennett Ford*, but also it listed factors from the *Restatement (Second) of Torts* needed to determine whether an interference is "improper." Only making the situation worse, we later decided *Hunt v. Riley*, 322 Ark. 453, 909 S.W.2d 329 (1995), and citing both *Fisher* and *Walt Bennett Ford*, the *Hunt* court set out the four elements of a tortious interference claim, but added that, "for an *interference* to be actionable, it *must be improper.*" This court in *Fisher* and *Hunt* never mentioned any intent to depart from its holding in *Walt Bennett Ford* or other cases that routinely followed the established rule in *Walt Bennett Ford* which held a plaintiff need not show a defendant's interference was improper.

---

dissenting. For some reason, the dissent was not filed, so it is now handed down in response to appellant's petition for rehearing.

In 1995, our Civil Instructions Committee met and adopted AMI Civ. 3d 406, which requires that the plaintiff must prove the following five elements to prove interference with contractual relationship or business expectancy:

(1)  plaintiff sustained damages;

(2)  plaintiff had a valid contractual relationship (and/or business expectancy);

(3)  defendant had knowledge of the contractual relationship and/or business expectancy;

(4)  defendant by intentional interference induced or caused a disruption or termination of the relationship and/or expectancy; and

(5)  the disruption or termination was a proximate cause of the plaintiff's damages.[2]

The foregoing instruction on (and definition of) tortious interference with contractual relationship was based upon a host of Arkansas cases where this court required the elements listed above, but made *no* mention of any "improper motive" requirement. As the reader will note, a number of these cases were decided even after the 1993 *Fisher* and 1995 *Hunt* decisions were rendered. *See Brown v. Tucker*, 330 Ark. 435, 954 S.W.2d 262 (1997); *Cross v. Arkansas Livestock & Poultry Comm'n*, 328 Ark. 255, 943 S.W.2d 230 (1997); *Belin v. West*, 315 Ark. 611, 864 S.W.2d 838 (1993); *Nicholson v. Simmons First Nat'l Corp.*, 312 Ark. 291, 849 S.W.2d 483 (1993) (Holt, C.J., Newbern and Brown, JJ., dissenting opinion); *W. E. Long Co. v. Holsum Baking Co.*, 307 Ark. 345, 820 S.W.2d 440 (1991); *Mid-South Beverages, Inc. v. Forrest City Grocery Co., Inc.*, 300 Ark. 204, 778 S.W.2d 218 (1989); *Conway Corp. v. Construction Eng'rs, Inc.*, 300 Ark. 225, 782 S.W.2d 36 (1989) (Substituted Opinion on Denial of Rehearing); *Jim Orr & Associ-*

---

[2] Cases often refer to four elements, combining (1) and (5) relating to damages, e.g., *Hunt v. Riley, supra.*

*ates v. Waters*, 299 Ark. 526, 773 S.W.2d 99 (1989); *L. L. Cole & Son, Inc. v. Hickman*, 282 Ark. 6, 665 S.W.2d 278 (1984).

In the 1984 *L. L. Cole & Son, Inc. v. Hickman* decision, this court said that the law has long been in general agreement that a third party who intentionally, and with malice, interferes with the contractual relations of another incurs liability for his action in tort. 282 Ark. at 9, 665 S.W.2d at 280 (1984). The court further explained this tort as follows:

> Such a tort is commonly termed "interference with contractual relations" or "tortious interference with contract," and has long been recognized in Arkansas. *Mason v. Funderburk*, 247 Ark. 521, 446 S.W.2d 543 (1969). For a full discussion see *Dobbs, Dan B.*, "Tortious Interference with Contractual Relationships," 34 Ark. L. Rev. 334. The elements of the tort of interference with contractual rights are thoroughly set out in *Walt Bennett Ford v. Pul. Co. Spl. Sch. Dist.*, 274 Ark. 208, 624 S.W.2d 426. *See also* Restatement, (Second) of Torts § 766 (1979). *Malice, or bad faith, is no longer in Arkansas an essential part of the plaintiff's case. See Walt Bennett Ford*, Supplemental Opinion on Petition for Rehearing, supra, and *Stebbins & Roberts, Inc. v. Halsey*, 265 Ark. 903, 582 S.W.2d 266 (1979). Punitive damages for the tort of interference with contractual relations may be awarded. *Id.* (Emphasis added.)

Later, in 1989, the court, citing to the *Walt Bennett Ford* Supplemental Opinion, again restated its rule that *bad faith need not be proven by the plaintiff* in order to recover for tortious interference with a contractual or business expectancy. *Conway Corp.*, 300 Ark. 225, 233, 782 S.W.2d 36, 40 (1989). (Emphasis added.) Instead, the court added, "[T]he defendant may show his interference was privileged . . . meaning "a defendant will not be liable if he acts, without bad faith, to protect the public interest or a third person to whom he stands in a relation of responsibility." *Id.* The court in *Conway Corp.* held that the defendants were entitled to such a privilege and concluded they had acted without bad faith. The *Conway Corp.* court adhered to the definition of bad faith as consisting of dishonest, malicious, or oppressive conduct

with a state of mind characterized by hatred, ill will, or a spirit of revenge. *Id.*

Confronted with the above case authority, our Civil Instructions Committee in 1995 quite accurately concluded AMI 3d 406, after listing the five recognized elements of the tortious interference of contract cause of action, by setting out the following affirmative defense:

> As a defense to the claims of the plaintiff, the defendant contends his conduct was privileged in that he acted without bad faith. Defendant has the burden of proving this defense.[3]

In sum, the AMI Civ. 3d 406 and 407 pattern instructions correctly reflect the above case authority defining tortious interference of a contractual relationship — only the misstatements of law wrongly attributed to *Walt Bennett Ford* by *Fisher* and *Hunt* fail to fit. Accordingly, I opt to follow the law as set out in instructions 406 and 407, and in doing so, I would reverse the trial court's decision.

I recognize that, based on the facts and evidence before us, Wal-Mart likely would prevail on the bad-faith defense issue. However, that is not the issue now before this court. Too, I would add that, while it might arguably be reasonable to place the burden on the plaintiff to show the defendant acted in "bad faith" in these type claims, that is not what the majority opinion requires. Rather, the majority, citing *Fisher* and *Hunt*, provides that, for an interference to be actionable, it must be "improper"— whatever that term means. Although *Fisher* sets out factors from § 767 of the *Restatement (Second) of Torts* that may be used to determine the meaning of "improper interference," I suggest those fac-

---

[3] The instruction concludes with "If you find from the evidence in this case that plaintiff has proven each of the five essential propositions and that defendant has failed to prove the defense of privilege, then your verdict should be for the plaintiff. . .; but if, on the other hand, you find from the evidence that any of the five propositions has not been proved by plaintiff (or that defendant has proved the defense of privilege), then your verdict shall be for the defendant.

tors are meaningless and offer no real guidance or measure. *See Fisher,* 311 Ark. at 458-59, 844 S.W.2d at 959 (1993).[4] To answer the questions posed by those factors offers no definitive character to the term "improper motive or means" and would leave the trial court and jury at a loss as to when improper interference by a defendant has occurred. To the contrary, the term "bad faith" in AMI Civ. 3d 407 is clearly defined to mean "dishonest, malicious, or oppressive conduct carried out with a state of mind characterized by hatred, ill will, or a spirit of revenge," and is consistent with the "malicious interference" terminology used in this court's cases of *Halsey, Hickman, Sampson,* and *Cross, supra.* At the very least, if the majority is to change Arkansas's existing law on this subject, it should take this opportunity to utilize terminology that has a definitive meaning and require plaintiff to show the defendant acted and interfered with bad faith.

Because I adhere to the heretofore long-settled Arkansas rule that placed the burden on the defendant to show his interference was justified, I would grant the appellant's petition for rehearing and reverse and remand this case.

In conclusion, I note that the majority opinion relies heavily on Professor Dobbs's suggestion that the tort of interference claim would be best served by placing the burden on the plaintiff to prove the defendant improperly interfered with the plaintiff's contractual relationship. *See* Dobbs, Dan B., *Tortious Interference with Contractual Relationships,* 34 ARK. L. REV. 334 (1984), citing

---

[4] Those factors are listed as follows:

(a) the nature of the actor's conduct;

(b) the actor's motive;

(c) the interests of the other with which the actor's conduct interferes;

(d) the interests sought to be advanced by the actor;

(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other;

(f) the proximity or remoteness of the actor's conduct to the interference; and

(g) the relations between the parties.

*Restatement (Second) Torts*, § 766 (1979). That suggestion, however, was rejected by this court in *L. L. Cole & Son, Inc.*, 282 Ark. 6, 665 S.W.2d 278 (1984). As already fully discussed, except for the aberrant holdings in the *Fisher* and *Hunt* cases that clearly misstate Arkansas law, our case law and AMI Civ. 3d Instructions very plainly provide that the plaintiff has no burden to show "improper" motive (or means) when posing interference, and instead requires the defendant to show his interference was justified.

ARNOLD, C.J., joins this dissent.