2010 Ark. App. 450

**WEST MEMPHIS ADOLESCENT RESIDENTIAL, LLC,**
Appellant

v.

**J.T. COMPTON; Jayco Acquisition & Holding, Inc.; Plantation Homes of Crittenden County, Inc.; Crymes Home Health, Inc.; Ray Boeckmann; Jeannie Boeckmann and Dayspring Behavioral Health Services, Inc., Appellees.**

No. CA 09–167.

Court of Appeals of Arkansas.

May 26, 2010.

Lawrence Wayne Jackson, Laura E. Partlow, Marion, AR, for appellant.

Howard Chadwick Yates, Morrilton, AR, Michael W. Mitchell, Emily J. Sneddon, Mitchell, Blackstock, Barnes, Wagoner, Ivers & Sneddon, P.L.L.C., Little Rock, AR, Joe M. Rogers, Fogleman & Rogers, West Memphis, AR, Richard D. White, Jr., Joe M. Fears, Barber & Bartz, Tulsa, OK, for appellee.

JOHN B. ROBBINS, Judge.

[1] West Memphis Adolescent Residential, LLC (WMAR), brings this appeal from the Crittenden County Circuit Court's grant of summary judgment in favor of appellees J.T. Compton; Jayco Acquisition & Holding, Inc.; Plantation Homes of Crittenden County, Inc. (Plantation); Crymes Home Health, Inc. (Crymes); Ray Boeckmann; Jeannie Boeckmann; and Dayspring Behavioral Health Services, Inc. (Dayspring), on WMAR's breach-of-contract [2] and tort claims.[1] WMAR raises two main points, each with several subpoints. We affirm in part and reverse and remand in part.

J.T. Compton controlled two Arkansas residential-care facilities-Plantation, in West Memphis, and Crymes, in Forrest City. In 2002, WMAR was a start-up mental-health-services provider that had not yet received its accreditation. In February 2002, it entered into lease agreements with Plantation and Crymes to provide mental-health services at their facilities. The period of each lease was for one year, with two one-year options to renew under the same or comparable terms. Either party could terminate these leases at any time with thirty days' notice. The leases also provided that the use and occupancy of the leased premises by WMAR was

---

1. On occasion, we will refer to J.T. Compton, Plantation, and Crymes collectively as the Compton appellees. When such a reference is made it refers to all three entities.

subject to the terms and conditions of the lease and to reasonable rules and regulations for the use thereof as prescribed from time to time by the lessors. WMAR began providing services at the facilities in March 2002.

In June 2002, WMAR entered into written services contracts with Plantation and Crymes. The contracts provided that they would remain in effect until cancelled. Both agreements provided that they "may only be canceled by either party by giving thirty (30) days written notice." The original typed number (30) in the provision was partially interlined and replaced with a numerical "60" that appeared to be initialed by Ray Boeckmann on behalf of Plantation and Crymes, and Rick Draper on behalf of WMAR.

Also in June 2002, WMAR entered into an agreement with Jeannie Boeckmann to be its clinical services director at the facilities. The relationship was stated to be that of an independent contractor and was for a period of one year, unless otherwise terminated. The contract could be terminated for cause at any time. It could also be terminated without cause upon thirty days' notice.

As part of its start-up phase, WMAR also entered into an agreement, common in the field at the time, with Dayspring for Dayspring to provide Medicaid billing services and assist WMAR in obtaining the accreditation it needed to submit bills to Medicare under its own name. This agreement included a provision that, for a period of five years after the termination or nonrenewal of the agreement, WMAR would not provide rehabilitative services in any county in which Dayspring was providing services at the time of the agreement, or in any county contiguous to those counties. The provision also stated that, during the term of the agreement, WMAR would not expand its services beyond certain listed counties. The agreement stated that it could not be terminated at any time without cause unless there was the written mutual consent of both parties. The agreement also included another termination provision that either party could terminate the agreement by providing ninety days' written notice to the other party.

During the first half of 2002, Compton had been attempting to find a buyer for the facilities after an earlier sale fell through. Jean–Ann Boschert of Counseling Consultants, Inc. (not a party), had an interest in purchasing the facilities because of her familiarity with them when her company had been the treatment provider there before being replaced by WMAR. In June 2002, Ray Boeckmann, Jeannie's husband, was hired by Compton to serve as facility administrator. Beginning in the summer of 2002, the Boeckmanns and Conipton discussed a purchase of the facilities by Ray Boeckmann. The Boeckmanns and Conipton entered into an agreement, dated August 7, 2002, for the sale of the real estate. The transaction closed on August 22, 2002, with possession to be delivered on September 1, 2002. Boeckmann and Dayspring later entered into a contract for Dayspring to provide mental health services to the residents.

On August 30, 2002, WMAR filed suit against appellees asserting tort and contract claims. The complaint alleged that appellees were engaged in a conspiracy to defraud WMAR and obtain benefits through fraud and tortious interference with WMAR's contracts with the various appellees. The complaint further alleged that appellees sabotaged WMAR's business by making false statements, depriving WMAR and its employees of access to the facilities, and by hindering performance of their own contracts with WMAR. The complaint sought a declaration of WMAR's rights under the two leases and the two

service contracts, as well as compensatory and punitive damages. The various appellees answered, denying the material allegations of the complaint.[2]

On April 5, 2005, Dayspring filed a motion for partial summary judgment on WMAR's tort claims. On April 13, 2006, the Conipton appellees filed a motion for partial summary judgment on the claims involving improper notice to WMAR. The Boeckmanns filed a motion for summary judgment.

After a hearing, the circuit court granted the various motions for summary judgment filed by appellees. The pertinent language from the court's order is as follows:

> [Appellees] had every right to improve their economic circumstances, even though it be to the detriment of [WMAR]. The existence of a contract between [WMAR] and [appellees] does nothing to alter that fact, unless the contract includes a clause that forbad them from competing with [WMAR]. The court has found no such clause, and is loath to write such a provision into the contract when the parties themselves did not do so.

The court issued a second order clarifying that it had found no support for the contention that appellees had breached the various contracts. On October 10, 2008, the court entered an order dismissing WMAR's complaint with prejudice. This appeal followed.[3]

### Arguments on Appeal

### I. Breach of Contract

■ When performance of a duty under a contract is due, any nonperformance is a breach. *Restatement (Second) of Contracts* § 235(2) (1981). Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement. *Cantrell–Waind & Assocs. v. Guillaume Motorsports, Inc.*, 62 Ark. App. 66, 968 S.W.2d 72 (1998) (quoting *Restatement (Second) of Contracts* § 205). Moreover, a party has an implied obligation not to do anything that would prevent, hinder, or delay performance. *See generally Community Bank of N. Ark. v. Tri–State Propane*, 89 Ark.App. 272, 203 S.W.3d 124 (2005).

First, WMAR concedes in its briefs that it asserted no contract claims against either Ray Boeckmann or Jayco Acquisition & Holding. Therefore, they are entitled to summary judgment on the contract claims.

Second, we also find that summary judgment was appropriate as to some of WMAR's breach-of-contract claims against Dayspring. In discovery, WMAR admitted that it had no evidence that Dayspring mishandled its claims. It is also undisputed that Dayspring sent two letters to WMAR indicating that Dayspring considered the agreement between the two parties to still be in effect.

■ We reach a different conclusion as to WMAR's dispute over whether Dayspring was withholding a larger percentage of funds than the parties agreed to in their contract and that this dispute was an attempt by Dayspring to destroy WMAR's business. The agreement between WMAR and Dayspring provided that WMAR would pay to Dayspring a manage-

---

**2.** Dayspring and the Boeckmanns both filed motions to dismiss prior to filing their answers. Those motions were denied by order entered on May 9, 2005. No issue about that disposition is raised in this appeal.

**3.** In addition to the notice of appeal from the October 10 order, WMAR also filed two "protective" notices of appeal, one from each of the earlier orders. Each notice was timely.

ment-utilization fee of 15 percent gross of all WMAR's Medicaid billings until such time as WMAR elected to bill its own services and to reimburse Dayspring for all data-processing charges incurred on behalf of WMAR, including EDS charges, which were $0.17 per billing item. Once WMAR began billing its own services, the rate paid to Dayspring would be reduced to 13 percent at the beginning of the next month. Scot Canfield, CEO and part-owner of WMAR, testified that Dayspring was supposed to withhold 15 percent of the amount received for WMAR's billings, but that Dayspring was withholding between 30 percent and 50 percent of WMAR's billings. Whether a breach of contract has occurred is a question of fact. *Worch v. Kelly,* 276 Ark. 262, 633 S.W.2d 697 (1982).

■ We also hold that the summary judgment should be reversed as to the Compton appellees on WMAR's breach-of-contract claim against them. WMAR argues that it was given insufficient notice as to the termination of its leases with the Compton appellees. It also argues that the Compton appellees breached their agreements, both the leases and the services contracts, by placing restrictions on WMAR's ability to access its patients.

The sale of the facilities to Ray Boeckmann did not, of itself, terminate the lease. *Prince v. Alford,* 173 Ark. 633, 293 S.W. 36 (1927). The provision allowing WMAR to renew the leases runs with the land and is enforceable against the Boeckmanns. *Prince, supra.* Thus, the sale of the facilities by Compton to the Boeckmanns could not terminate WMAR's leases to the facilities without proper notice being given to WMAR.

There are too many unanswered questions for us to say with certainty that the Compton appellees did not breach their leases and services contracts with WMAR.

*See Cox v. McLaughlin,* 315 Ark. 338, 867 S.W.2d 460 (1993). It is undisputed that J.T. Compton sent an August 1, 2002 letter to WMAR, stating that he was terminating the "contract" as of August 30, 2002. However, Mr. Canfield testified that he did not receive this letter until August 14, 2002. Moreover, it is unclear what "contract" Compton was referring to because there were four such agreements between his entities and WMAR. Adding to the uncertainty is an August 16, 2002 follow-up letter by Compton's attorney clarifying the August 1 letter. The August 16 letter stated that the sixty-day-notice period in the services contracts was unauthorized and that thirty days' notice was sufficient.

It is also unclear whether WMAR was allowed to return to the facilities after an August 21, 2002 incident where police were called because a WMAR employee was attempting to remain on the premises in violation of a memorandum Ray Boeckmann issued the previous day, directing that, effective immediately, all WMAR personnel will leave the premises no later than 4:30 p.m. and that they would not have access to the facilities on the weekends. The leases allowed the Compton appellees as lessors to make reasonable rules and regulations for the use of the leased property. The services contracts, however, do not contain a provision allowing the facilities to make rules that limit WMAR's access to the patients or otherwise interfere with WMAR's ability to provide services. Therefore, we reverse the summary judgment in favor of the Compton appellees on WMAR's breach-of-contract claims and remand for further proceedings.

## II. Breach of Fiduciary Duty

■ WMAR next argues that appellees breached their contracts with WMAR by breaching their fiduciary duties to

WMAR. Before there can be a breach of a fiduciary duty, a fiduciary relationship or a confidential relationship must exist. Contracting parties do not necessarily owe fiduciary duties to each other. *See Evans Indus. Coatings, Inc. v. Chancery Court of Union County,* 315 Ark. 728, 870 S.W.2d 701 (1994). WMAR does not explain what relationships of trust or confidence were developed with the various appellees because of the agreements. The circuit court could properly determine that none of the appellees owed a fiduciary duty to WMAR and, therefore, summary judgment was proper on this part of WMAR's claim.

## III.  Breach of Implied Covenants of Good Faith and Fair Dealing

■ WMAR also contends that there are factual issues in dispute as to whether appellees breached their contractual duties of good faith and fair dealing. Arkansas law, however, does not recognize a separate tort cause of action for breach of those implied covenants. *Preston v. Stoops,* 373 Ark. 591, 285 S.W.3d 606 (2008). The *Preston* court restated that Arkansas case law only recognizes the tort of bad faith against insurance companies. WMAR does not address Preston despite Dayspring's reliance on it. Because Arkansas law does not recognize the cause of action WMAR brought against the appellees, they were entitled to judgment as a matter of law.

## IV.  Tortious Interference with Contract

Finally, WMAR argues that the circuit court erred in granting summary judgment on its claims for tortious interference. We disagree.

■ Arkansas has recognized wrongful interference with a contract as an actionable tort for over a century. *See Mahoney v. Roberts,* 86 Ark. 130, 110 S.W. 225 (1908). The elements of tortious interference that must be proved are (1) the existence of a valid contractual relationship or a business expectancy; (2) knowledge of the relationship or expectancy on the part of the interfering party; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted. *Crockett v. C.A.G. Invs., Inc.,* 2010 Ark. 90, 361 S.W.3d 262. It is also required that the defendant's conduct be at least "improper" for a valid tortious-interference claim. *Id.* Arkansas law also recognizes a privilege to compete, and the scope of this privilege is broad:

In short, it is no tort to beat a business rival to prospective customers. Thus, in the absence of prohibition by Statute, illegitimate means, or some other unlawful element, a defendant seeking to increase his own business may cut rates or prices, allow discounts or rebates, enter into secret negotiation behind the plaintiff's back, refuse to deal with him or threaten to discharge employees who do, or even refuse to deal with third parties unless they cease dealing with the plaintiff, all without incurring liability.

*Office Machines, Inc. v. Mitchell,* 95 Ark. App. 128, 234 S.W.3d 906 (2006) (citing *Kinco, Inc. v. Schueck Steel, Inc.,* 283 Ark. 72, 77, 671 S.W.2d 178, 181 (1984) (quoting W. Prosser, *Law of Torts,* § 130 (3d ed.1971)). The *Kinco* court also adopted the following definition of the circumstances under which competition will justify interfering with another's business expectancy:

(1) One who intentionally causes a third person not to enter into a prospective contract relation with another who is his competitor or not to continue an existing contract terminable at will does not interfere improperly with the other's

relation if (a) the relation concerns a matter involved in the competition between the actor and the other and (b) the actor does not employ wrongful means and (c) his action does not create or continue an unlawful restraint of trade and (d) his purpose is at least in part to advance his interest in competing with the other.

283 Ark. at 78, 671 S.W.2d at 181–82 (quoting *Restatement (Second) of Torts*, § 768 (1977)). Our supreme court has noted that tortious interference with business expectancy is distinguishable from the privilege to compete. *Stewart Title Guar. Co. v. American Abstract & Title Co.*, 363 Ark. 530, 215 S.W.3d 596 (2005); *see also Hayes v. Advanced Towing Services, Inc.*, 73 Ark. App. 36, 40 S.W.3d 800 (2001). The supreme court has adopted the factors in *Restatement (Second) of Torts* § 767 (1979), for guidance about what is "improper" interference with the performance of a contract. *Mason v. Wal–Mart Stores, Inc.*, 333 Ark. 3, 969 S.W.2d 160 (1998); *see also K.C. Props. of N.W. Ark., Inc. v. Lowell Inv. Partners, LLC*, 373 Ark. 14, 280 S.W.3d 1 (2008).

According to WMAR, appellees acted "improperly" because they were motivated, in part, by greed; they conspired to act in concert to force WMAR out of business; and they recruited WMAR's employees to staff their new business. We hold that none of these allegations established that appellees acted improperly.

In *Mason v. Wal–Mart Stores, supra*, the supreme court held that allegations that the defendant in a tortious-interference case was motivated by "greed" could easily be replaced by allegations that the defendant's objective was motivated by a desire for profits and thus not improper. 333 Ark. at 14, 969 S.W.2d at 166. The fact that appellees engaged in secret negotiations for the sale of the facilities and for other contracts without informing WMAR is also not improper. *Kinco, supra*. The allegations that appellees recruited WMAR's employees is likewise not improper in the absence of a contractual provision prohibiting those employees from going to work for one of WMAR's competitors. *Office Machines, Inc. v. Mitchell, supra*. WMAR has failed to show that appellees did anything more than engage in privileged competition. The circuit court, therefore, did not err in granting summary judgment on the tortious interference claim.

For the benefit of the appellate bar, we note that WMAR has included many unnecessary documents in its addendum, such as multiple copies of the various contracts and leases; motions to dismiss and orders denying the motions; motions and orders on discovery disputes; motions in limine; scheduling orders; orders extending the time to respond to summary judgment motions; and protective orders. None of these documents were necessary to the arguments made on appeal. They total more than 150 pages of an addendum that contains 742 pages. Under Supreme Court Rule 4–2(a)(8), the contents of the addendum are to be limited to only those items necessary to an understanding of the issues on appeal or our jurisdiction. We have pointed out that an abstract and addendum can be deficient for containing *too much material*, as well as too little. *See American Transp. Corp. v. Exchange Capital Corp.*, 84 Ark.App. 28, 129 S.W.3d 312 (2003); *Miller v. Hometown Propane Gas, Inc.*, 82 Ark.App. 82, 110 S.W.3d 304 (2003).

Affirmed in part; reversed and remanded in part.

GRUBER and HENRY, JJ., agree.