SEECO, INC., et al. *v.* Allen HALES, et al.

96-1392                                                                 954 S.W.2d 234

Supreme Court of Arkansas
Opinion delivered October 30, 1997

*Everett & Mars*, by: *Thomas A. Mars*; *Kenneth S. Gould*; and *John J. Watkins*, for appellants.

*Harper, Young, Smith & Maurras, PLC*, by: *Don A. Smith* and *S. Walton Maurras*; *Marilyn J. Eickenhorst*; and *Gable Gotwals Mock Schwabe*, by: *James M. Sturdivant*, *M. Benjamin Singletary*, and *Timothy A. Carney*, for appellees.

ROBERT L. BROWN, Justice. Appellants SEECO, Inc. (SEECO), and Arkansas Western Gas Company (AWG) are wholly owned subsidiaries of appellant Southwestern Electric Company (Southwestern). Appellees Allen Hales, et al. (the royalty owners), are lessors under various oil and gas leases possessed by SEECO who brought a class action suit to claim royalties that were allegedly due but not paid. The trial court certified the royalty owners as a class after considering the criteria set out in Rule 23(a) and (b) of the Arkansas Rules of Civil Procedure. The class is estimated to consist of more than 3,000 members. SEECO, AWG, and Southwestern have appealed the class certification and specifically contest the trial court's findings that common questions of law and fact predominate over questions affecting individual class members. The appellants further reject the claim that the royalty owners' class action is the superior method for the fair and efficient adjudication of this controversy. As a corollary issue, the appellants contend that the constitutional right to trial by jury will be skewed by having bifurcated trials with one jury deciding common questions for the royalty owners and a second jury determining individual questions. We affirm.

In their complaint, the royalty owners claim that SEECO failed to enforce the provisions of a gas-sales contract, known as Contract 59, against AWG and further failed to pay the royalty owners the proper proceeds from the gas produced under the numerous SEECO leases affected by the contract. The complaint states that Contract 59 was entered into between SEECO and AWG on July 24, 1978. It alleges that under Contract 59 SEECO dedicated acreage in Franklin, Johnson, Washington, Crawford, and Logan Counties for oil and gas production, and that AWG obligated itself for 20 years to purchase volumes of gas under a "take-or-pay" arrangement at a guaranteed price. That arrangement provided that the purchaser (AWG, in this instance) would either buy a volume of gas at the contract price or pay a specified price without taking the gas. The royalty owners allege that throughout the term of Contract 59, SEECO did not require AWG to pay the guaranteed prices or take the required volumes of gas per the terms of the agreement.

The royalty owners further allege: (1) that SEECO allowed AWG to freeze gas prices below the contract price for the period between December 1984 and July 1, 1994; (2) that SEECO imprudently and arbitrarily released wells, acreage, and production from Contract 59 throughout the term of the contract, which resulted in the sale of gas for less than the contract price; (3) that SEECO failed to drill additional wells and fully develop a plan for increased production on the royalty owners' acreage; and (4) that SEECO continuously provided gas storage to AWG without compensation. Other misdeeds by SEECO were set out in the complaint which, according to the royalty owners, resulted in lower prices for gas and, thus, less proceeds for them.

The royalty owners also allege that SEECO fraudulently concealed its failures under Contract 59 by intentionally refusing to document the pricing and other deficiencies under Contract 59. They state that SEECO engaged in conduct favorable to AWG due to their relationship as affiliate companies wholly owned by Southwestern and that SEECO's course of conduct resulted in significant losses to the royalty owners.

The complaint specifically alleges that in 1987 SEECO solicited the purchase of mineral interests from the royalty owners and misrepresented the market price for natural gas. In that solicitation letter, SEECO noted that gas prices had been declining in recent years, but, according to the allegation, SEECO failed to disclose that under Contract 59 AWG was obligated to make minimal volume purchases of gas and to pay for that gas at a certain price. The complaint also asserts that in a 1983 letter SEECO advised the royalty owners that it had entered into a gas–sales contract with Natural Gas Pipeline (NGP) which would result in reduced royalties. The royalty owners claim that SEECO failed to disclose that the same gas dedicated under the NGP contract was already dedicated under Contract 59, with its take-or-pay provision, at a significantly higher purchase price.

The royalty owners seek compensatory damages in excess of $58,450,000 and punitive damages against appellants, jointly and severally, on the legal theories of: (1) fraud and constructive fraud; (2) breach of the oil and gas leases; (3) breach of the duty to mar-

ket the gas reasonably; (4) breach of the duty of good faith and fair dealing; (5) violation of Ark. Code Ann. §§ 15-74-601 & -602 (Repl. 1994), which govern penalties for fraudulently withholding oil and lease payments; (6) unjust enrichment; (7) tortious interference with contractual relations; (8) civil conspiracy; and (9) violation of Ark. Code Ann. § 15-72-305 (Repl. 1994), which requires calculation of royalties on a weighted-average price. The royalty owners also asked for certification of a class pursuant to Rule 23 of the Arkansas Rules of Civil Procedure.

At the class-certification hearing, Dr. David Taylor testified that he was a named plaintiff seeking to become a class representative because of his royalty interests in eleven oil and gas leases dedicated under Contract 59. He testified that his claims concerned the lack of enforcement of Contract 59 regarding the price of gas sold by SEECO to AWG as well as the volume of gas to be purchased. On cross-examination, Dr. Taylor stated that SEECO had voluntarily converted the leases from fixed-price leases to proceeds leases based on its performance over the last number of years. He also contended that the terms of the leases should not control because SEECO and AWG were affiliates which were not dealing at arms' length; therefore, the royalty-price determination should be dictated by the terms of Contract 59, as opposed to his leases. Dr. Taylor further contended that there was fraud in connection with the 1983 letter and the 1987 solicitation letter sent out by SEECO because neither letter made reference to Contract 59 and AWG's take-or-pay obligation under that contract.

In rebuttal, SEECO attacked Dr. Taylor's assertion of fraudulent concealment and showed that Contract 59 had been on file with the Arkansas Public Service Commission (PSC) since 1978 or 1979. SEECO also offered several newspaper articles with information that, it argued, should have put royalty owners on notice about pricing. One was a January 21, 1991 article entitled "Purchasing Practices Defended by Company," from the *Ozark Spectator*, which documented challenges from the PSC and the Attorney General's Office regarding high prices paid by AWG, which were passed on to ratepayers under Contract 59. A second article was a January 15, 1993 story entitled "Gas Company Left Prices High, PSC Told" from the *Arkansas Democrat-Gazette*,

which also indicated that AWG was paying too much under Contract 59. Finally, a November 1, 1994 article entitled "Settlement Reached After 3 Years" in the *Northwest Arkansas Times* documented a settlement between the Attorney General's Office, PSC staff, SEECO, and AWG, causing a reduction for AWG ratepayers because Contract 59 violated Arkansas's least-cost purchasing law. Dr. Taylor testified that he was unaware of these articles.

Allen Franklin Hales, another named plaintiff and potential class representative, testified that he was asking for certification as a royalty owner under two leases with SEECO which were dedicated to Contract 59. In his deposition, Hales echoed Dr. Taylor's concerns about the fact that the 1983 and 1987 letters were silent about Contract 59. Dr. Robert Gordon Jeffers also testified by deposition that SEECO should have enforced Contract 59.

Brooks Clower, an attorney employed by Southwestern, testified that he perused the oil and gas leases of Dr. Taylor, Dr. Jeffers, and Mr. Hales, and concluded that some leases contained a fixed-price royalty and a disclaimer of implied covenants, while other leases provided for royalties to be paid on a proceeds basis and did not contain a disclaimer clause. He also testified that the various leases differed with respect to government-regulation clauses, which would make some leases subject to certain defenses that would be unavailable in connection with other leases. The leases also differed in form, with Dr. Taylor, for example, having three different types of leases. Clower testified that the leases may or may not be subject to pooling agreements made for the purpose of forming a drilling unit, which would also vary the terms of the lease agreements.

The trial court entered an order certifying the class of royalty owners affected by the alleged acts and omissions of SEECO, AWG, and Southwestern. Two subclasses were created based on whether the subclass leases were leased to SEECO and dedicated under Contract 59, or leased to third parties and affected by Contract 59. The trial court's order found that the following common and predominating issues existed:

> The evidence produced by the plaintiffs indicates: an alleged overall scheme and course of conduct by the defendants designed

to defraud the members of the proposed class as a group irrespective of the type of oil and gas lease or the volume of production from the leases; that SEECO in deference to Arkansas Western Gas Company's interest allegedly failed to enforce the take, price and other provisions of Contract 59 almost since the contract's inception and actively concealed such conduct from the proposed class; that the defendants failed to state material facts in correspondence which appears to have been sent to members of the potential class including citizens and residents of this judicial district; the defendants intentionally failed to keep documentary records of the deficiencies under Contract 59 for fear of discovery of such deficiencies by the members of the proposed class; and the defendants allegedly engaged in actions before the Arkansas Public Service Commission designed to conceal their actions from the members of the proposed class.

## I.  Predominance

The appellants urge that the trial court erred in its predominance finding. We observe initially that trial courts are given broad discretion in matters of class certification. *Direct Gen. Ins. Co. v. Lane*, 328 Ark. 476, 944 S.W.2d 528 (1997); *Union Nat'l Bank v. Barnhart*, 308 Ark. 190, 823 S.W.2d 878 (1992); *First Nat'l Bank v. Mercantile Bank*, 304 Ark. 196, 801 S.W.2d 38 (1990). Appellants claim, however, that the following issues, which can only be resolved individually, illustrate that the trial court abused its discretion in certifying the class: (1) differences in the leases with respect to their form, (2) differing bases for determining royalties, (3) the presence or absence of waivers of implied covenants, (4) the presence or absence of government-regulation clauses; (5) the effect of pooling agreements on the leases; (6) the difficulty of determining damages, especially with respect to Subclass II, which involves contracts between third-party producers or operators and purchasers affected by Contract 59; (7) proof of reliance in support of the claims for fraud; and (8) proof of reasonable diligence with respect to claims of fraudulent concealment. The royalty owners respond with the argument that the one issue that permeates every claim is appellants' fraudulent and wrongful course of action taken against the royalty owners in light of Contract 59.

■    Five cases provide a compendium of this court's recent statements and holdings on predominance. In *Arkansas La. Gas Co. v. Morris*, 294 Ark. 496, 744 S.W.2d 709 (1988), the trial court certified a class action brought by fixed-price lessors owning mineral tracts in the Cecil Field against the appellants, collectively referred to as ArkLa. The class sought royalties on a proceeds basis under ten different theories with respect to new wells that were drilled, including estoppel, waiver, and reformation. ArkLa challenged the class under the requirements of Rule 23(b) of the Arkansas Rules of Civil Procedure and asserted that the case would require individual proof of detrimental reliance for each class member under the estoppel theory and also either proof of mutual or unilateral mistake or proof of fraud or inequitable conduct for success on the reformation theory. We affirmed the trial court and noted that even if ArkLa's arguments were correct, the class presented alternative theories for recovery that presented common questions. We stated that a common question existed as to whether appellants' course of conduct, which included ignoring the fixed prices contained in the leases, gave rise to a cause of action in favor of the fixed-price lessors. We then concluded that if the trial court found that the evidence presented individual questions of reliance or mistake, it could defer those individual questions until after it disposed of the questions common to the class. Accordingly, this court established a procedure of handling the common issues first, recognizing that the trial court, in its discretion, could later resolve the individual questions.

This approach was embraced in *International Union of Elec., Radio & Mach. Workers v. Hudson*, 295 Ark. 107, 747 S.W.2d 81 (1988). There, the trial court certified a class of non-union salaried and hourly employees who sued a labor union and its local chapter for loss of wages, personal injury, and property damage that occurred during a three-day period while the class attempted to work through a strike. Specifically, the trial court certified two subclasses: one containing those appellees who were deprived of the opportunity to work over the three-day period; and those appellees who suffered personal or motor-vehicle damages or both while attempting to cross the picket line.

In affirming the trial court's decision, this court determined that the common question of the unions' liability for the actions of their members predominated. We again advocated an approach of deciding the merits of the common issue first:

> The central question of the unions' liability will be the focus of the class action. That can be decided with respect to the sub-classes even though the alleged mass action was not an instantane-ous event. Again, if they are held liable in general, the unions will be able to present any defenses they may have as the claims of the individual class members are presented thereafter, the only effect of the decision being that the individual class members will not have to prove, and the court will not have to decide, the general question of liability in each case.

*International Union of Elec., Radio & Mach. Workers v. Hudson*, 295 Ark. at 120, 747 S.W.2d at 88.

To the same effect was this court's decision in *Lemarco, Inc. v. Wood*, 305 Ark. 1, 804 S.W.2d 724 (1991). In *Lemarco*, a class was certified which consisted of persons who entered into retail install-ment membership contracts with Lemarco, a private buyers club. We estimated the potential size of the class at about 800 members. Appellees asserted that Lemarco defrauded them of membership fees by promising free gifts for attending sales presentations and misrepresenting the value of membership. This court affirmed the trial court's decision on the basis that predominance was satisfied because there were common issues of fact arising out of Lemarco's sales training, solicitation mailing, sales presentations, installment contracts, and its intentions with regard to all of them. We con-cluded by discussing the predominance and superiority questions in tandem. We followed *Hudson* and held that common issues should be resolved first to attain real efficiency. We then stated:

> Even if the trial court eventually determines that the cases have to splinter with respect to some individual claims, efficiency would still have been achieved by resolving those common questions which predominate over individual questions. Finally, pursuing this case as a class action is fair to both sides. Lemarco can offer evidence concerning its sales training, solicitation mailings, sales presentations, installment contracts, and its intentions regarding all of them. It can also present individual defenses to the claims

of individual class members, if necessary, once the common questions have been determined. A class action approach is also fair to the class members in that they probably would not sue if they could not do so as a class since it would not be economically feasible to do so.

*Lemarco, Inc. v. Wood*, 305 Ark. at 4, 804 S.W.2d at 726.

This rationale continued to hold sway in *Summons v. Missouri Pac. R.R.*, 306 Ark. 116, 813 S.W.2d 240 (1991). In that case, the trial court refused to certify a class of about 5,000 North Little Rock residents and business people who were forced to evacuate the area when a railroad accident caused a chemical tank car to overturn. The residents sought a recovery against the railroad and Union Carbide under theories of negligence and strict liability for expenditures on food, clothing, shelter, medical treatment, and damages for pain and mental anguish. This court determined that the trial court abused its discretion in not certifying the class because the questions regarding liability for negligence and strict liability predominated over any individual issues, and because a class action was a superior method for handling the numerous claims. We concluded that the repeated litigation of the liability question and the possibility of inconsistent results outweighed the fact that each claimant would have different damage evidence. We reversed the trial court and approved the class certification even though this court recognized that each claimant would have the burden of proving that the railroad's conduct was the proximate cause of his damages.

The case of *Arthur v. Zearley*, 320 Ark. 273, 895 S.W.2d 928 (1995) followed. In that case, this court determined that the trial court abused its discretion in certifying a class of plaintiffs who brought claims for medical negligence, battery, fraud, outrage, strict liability, and breach of warranty arising out of the implantation of Orthoblock into their spines. Appellants, who were the manufacturer of Orthoblock and the doctors and medical facilities responsible for the surgical procedures, argued that the issue of informed consent was a predicate to the individual claims and could not be tried on a class basis. This court agreed, as it was clear that each plaintiff would be required to testify about oral communications with his physician and that the issue of informed

consent was woven throughout the claims for negligence, battery, outrage, and fraud or fraudulent concealment. This court also concluded that the issue of causation would require focus on individual claims, as each person who received the Orthoblock treatment would be required to place his or her medical condition into evidence. Although this court acknowledged the presence of common issues, it determined that the large number of individual questions rendered individual actions the superior means for obtaining efficiency and fairness.

SEECO now asserts in the present appeal that *Arthur v. Zearley, supra,* essentially changed our caselaw on class actions because we renounced the certification of a class of plaintiffs with individual claims as opposed to upholding certification to resolve common issues and deferring individual issues until later in the proceeding. We disagree with that characterization of the *Zearley* decision. What is alleged in the case at hand is a single course of fraudulent conduct perpetrated by the appellants and directed at the royalty owners, with each plaintiff depending on the same facts and legal arguments for recovery. The issue of a fraudulent scheme is central to the instant case and a common starting point for all class members. *Arthur v. Zearley, supra,* simply had no common issue, and we recognized in that case that individual issues of informed consent and causation were the essence of the claims of each separate plaintiff.

In support of their argument that individual issues predominate, SEECO, AWG, and Southwestern point to the fact that the royalty owners seek recovery based on a fraud theory that requires proof of reliance by each plaintiff. The appellants are correct that to prove actual fraud, evidence of justifiable reliance must be offered. *Sexton Law Firm, P.A. v. Milligan,* 329 Ark. 285, 948 S.W.2d 388 (1997); *Calandro v. Parkerson,* 327 Ark. 131, 936 S.W.2d 755 (1997); *Clark v. Ridgeway,* 326 Ark. 378, 914 S.W.2d 745 (1996). Moreover, under Arkansas law, fraud is never presumed, and clear and convincing testimony must exist to prove its elements. *Nicholson v. Simmons First Nat'l Corp.,* 312 Ark. 291, 849 S.W.2d 483 (1993); *Interstate Freeway Serv., Inc. v. Houser,* 310 Ark. 302, 835 S.W.2d 872 (1992). In the same vein, appellants assert that there are individual issues with respect to the assertion

of fraudulent concealment, particularly surrounding the requirement that the royalty owners exercise reasonable diligence to discover any fraudulent concealment. *See Milam v. Bank of Cabot,* 327 Ark. 256, 937 S.W.2d 653 (1997); *Norris v. Baker,* 320 Ark. 629, 899 S.W.2d 70 (1995); *First Pyramid Life Ins. Co. v. Stoltz,* 311 Ark. 313, 843 S.W.2d 842 (1992).

█ It is clear from our caselaw that individual questions relating to a class member's reliance for an estoppel claim (*Arkansas La. Gas Co. v. Morris, supra*) or reliance for a misrepresentation claim (*Lemarco, Inc. v. Wood, supra*) will not defeat class certification. Moreover, one distinguished treatise, NEWBERG ON CLASS ACTIONS, supports this position:

> Challenges based on the statute of limitations, fraudulent concealment, releases, causation, or reliance have usually been rejected and will not bar predominance satisfaction because those issues go to the right of a class member to recover, in contrast to underlying common issues of the defendant's liability.

1 Herbert B. Newberg, NEWBERG ON CLASS ACTIONS § 4.26, at 4-104 (3d ed. 1992).

Other courts have reached the same conclusion in common-law fraud claims despite the reliance requirement. *See, e.g., Walco Investments, Inc. v. Thenen,* 168 F.R.D. 315 (S.D. Fla. 1996)(certifying global class of investors who brought several claims, including common-law fraud, against promoters allegedly involved in a Ponzi scheme; numerous common questions of law and fact connected to the fraud allegations predominated over individual issues); *Murray v. Sevier,* 156 F.R.D. 235 (D. Kan. 1994)(stating that common issues are found under a common-law fraud claim that involves written misrepresentations and/or omissions; reliance might be shown by proving that the misrepresentations were material to a person who would have read it); *Smith v. MCI Telecommunications Corp,* 124 F.R.D. 665 (D. Kan. 1989)(certifying a claim for common-law fraud arising from misrepresentations relative to the payment of commissions; reliance on the terms of written documents given to all salespersons could be established by proving their employment with MCI); *Alexander v. Centrafarm Group, N.V.,* 124 F.R.D. 178 (N.D. Ill. 1988)(allowing pendent

common-law fraud claim in a securities action; holding there was no indication that reliance would create significant individual issues because the alleged misrepresentations were contained in a proxy statement uniform to all class members). *But see, e.g., Kelley v. Mid-America Racing Stables, Inc.*, 139 F.R.D. 405 (W.D. Okl. 1990)(denying certification for pendent common-law fraud claim in a securities action; stating that every member of the proposed class would have to testify as to his reliance on the prospectus).

As to appellants' contention of lack of reasonable diligence in discovering fraudulent concealment, the majority view appears to be that this lapse does not operate as a bar to a finding of predominance in the common issue. *See, e.g., In Re Indus. Diamonds Antitrust Litigation*, 167 F.R.D. 374 (S.D. N.Y. 1996); *In Re Catfish Antitrust Litigation*, 826 F. Supp. 1019 (N.D. Miss. 1993); *Town of New Castle v. Yonkers Contracting Co.*, 131 F.R.D. 38 (S.D. N.Y. 1990).

▮ We hold that although the fact that lack of reliance and diligence may be arguments raised by the appellants, these challenges will not override the common question relating to the allegation of a scheme perpetrated by the appellants. The overarching issue which must be the starting point in the resolution of this matter relates to the existence of the alleged scheme. There was no abuse of discretion by the trial court.

▮ Appellants also raise a challenge to the constitutionality of bifurcated trials under Article 2, section 7, of the Arkansas Constitution. They assert that a bifurcated procedure could infringe upon their jury-trial right, if the matter began with one jury deciding common issues but concluded with a second jury determining individual issues. We do not know at this juncture whether the trial court will use multiple juries. Thus, any opinion on the subject would be advisory in nature. *See, e.g., Baker Car & Truck Rental, Inc. v. City of Little Rock*, 325 Ark. 357, 925 S.W.2d 780 (1996). We decline to address this issue.

## II. Superiority

▮ Rule 23(b) further requires that a class action be superior to other available methods for the fair and efficient adjudica-

tion of the controversy. As noted, this court has held repeatedly that real efficiency can be had if common, predominating questions of law or fact are first decided, with cases then splintering for the trial of individual issues, if necessary. *See, e.g., Farm Bureau Mutual Ins. Co. v. Farm Bureau Policy Holders*, 323 Ark. 706, 918 S.W.2d 129 (1996); *Summons v. Missouri Pac. R.R., supra; Lemarco, Inc. v. Wood, supra; International Union of Elec., Radio & Mach. Workers v. Hudson, supra.*

■ Moreover, to repeat in part what we said in *Lemarco, Inc. v. Wood, supra,* a class action is fair to both sides. The appellants can present evidence of fair dealing with the royalty owners and may prevail on this core issue. They can also present individual defenses subsequently, should this prove to be necessary. This procedure is fair to the royalty owners because to sue as individuals may not be economically feasible. We hold that a class action is the superior method for adjudicating this controversy. Again, there was no abuse of discretion by the trial court in certifying the class.

Affirmed.

THORNTON, J., dissents.

RAY THORNTON, Justice, dissenting. I would reverse because I do not find that either the trial court's order or the record reflects the type of rigorous analysis that I believe is required under Rule 23 to determine the reasons why the common questions predominate over the individual questions and why a class action is superior to other methods of trying the issues. Therefore, I respectfully dissent for the reasons stated in the dissenting opinion in *Mega Life & Health Ins. Co. v. Jacola,* 330 Ark. 261, 954 S.W.2d 898 (1997).