Wayne and Sylvia FRALEY, Individually
and On Behalf of Others Similarly Situated *v.*
WILLIAMS FORD TRACTOR
and EQUIPMENT COMPANY

99-235 5 S.W.3d 423

Supreme Court of Arkansas
Opinion delivered December 2, 1999 .

*Watkins & Scott, PLLC,* by: *John R. Scott;* and *Williams & Anderson LLP,* by: *Leon Holmes, Peter Kumpe,* and *Stephen B. Niswanger,* for appellants.

*Davis, Cox & Wright PLC,* by: *Constance G. Clark, Tilden P. Wright III,* and *John G. Trice,* for appellee.

ANNABELLE CLINTON IMBER, Justice. This is an interlocutory appeal. Wayne and Sylvia Fraley (the Fraleys), individually and on behalf of others similarly situated, contend that the trial court abused its discretion when it denied class certification of their claims against Williams Ford Tractor and Equipment Company (Williams Ford) for conversion, fraudulent concealment, constructive bailment, and violation of the federal Truth in Lending Act. We agree, and reverse and remand the case.

The Fraleys filed their original complaint against Williams Ford in the Circuit Court of Washington County, Arkansas on June 18, 1996. In their original complaint, the Fraleys alleged that between the years 1991 and 1995 they entered into four separate retail installment contract and security agreements with Williams Ford to purchase agricultural, commercial, and consumer equipment, and that Williams Ford financed not only the purchase price of the equipment, but also the premiums for property and credit life insurance. The Fraleys further alleged that when there was an early payoff of the full purchase price as the result of payment, refinancing, or repossession, the insurance company refunded any unearned premium to Williams Ford, but that the Fraleys never received the refund or a credit in the amount of the refund from Williams Ford.

In addition to their claim for conversion of the premium refunds, the Fraleys alleged that Williams Ford failed to disclose information about the cost and term of property insurance; that the insurance was part of the financed purchase price; and that a credit or refund would be issued for unearned premiums, all of which violated the federal Truth in Lending Act (TILA). They sought compensatory damages of $5,177.80, double the finance charges paid under their contracts, punitive damages and attorney's fees.

On February 23, 1998, the Fraleys filed an amended complaint asserting a class action against Williams Ford. The amended complaint included the allegations mentioned above, and asserted additional claims of fraudulent concealment and constructive bailment. The amended complaint designated two classes of plaintiffs:

> Class A is comprised of those Debtors who paid off their loans early or refinanced their balance but did not receive refunds or credits from [Williams Ford] for unearned insurance premiums. Class A seeks redress under the common law of conversion.
>
> * * *
>
> Class B is comprised of those Debtors who executed a transaction with [Williams Ford] and who failed to receive information from [Williams Ford] about the costs or refunds of insurance on the Debtors' Retail Installment Contracts and Security Agreements as prescribed by the TILA. Class B includes only those Debtors for whom credit was extended primarily for consumer purposes and in an amount not exceeding $25,000.00.

The amended complaint asserted that the size of each class was more than 100 persons based upon information and belief, but averred that information about the exact size and existence of each class was entirely within the possession of Williams Ford or a third party.

The Fraleys filed a motion to certify the class action pursuant to Ark. R. Civ. P. 23 on April 15, 1998, along with the affidavit of another Williams Ford customer, Mr. Richard Mayes. Mr. Mayes averred in his affidavit that he purchased insurance coverage through Williams Ford and that the premiums were financed with the balance of the equipment purchase price. According to Mr. Mayes, when he paid off the full purchase price on this equipment and financed new equipment at a later date, Mr. Don Williams, President of Williams Ford, requested that he endorse a refund check for unearned premiums mailed to Williams Ford by the insurance company. Mr. Mayes complied with that request, but Williams Ford kept the premium refund despite his repeated demands for payment.

In preparation for the class–certification hearing, the Fraleys filed a third set of interrogatories and requests for production of documents which sought information and documents from Wil-

liams Ford about the identity of (1) debtors who paid off loans early or refinanced those loans at any time from January 1, 1990, to the present and (2) debtors whose federal TILA disclosure forms dated any time from January 1, 1990 to the present, omitted information concerning costs or refunds of insurance under the debtors's retail installment contracts and security agreements. Williams Ford did not provide the requested information to the Fraleys, but instead objected on the basis that pre-certification discovery requests by the Fraleys sought information that was outside the scope of discovery under Ark. R. Civ. P. 26(b) and was not relevant or material to the subject matter of the litigation. Williams Ford also asserted that the discovery requests were overly broad and unduly burdensome. Notwithstanding these objections, Williams Ford filed the affidavit of the secretary and co-owner of Williams Ford, Mrs. Maribelle Williams, on June 3, 1998, the day before the class-certification hearing. This affidavit disclosed that Mrs. Williams had searched the records of Williams Ford and two insurance companies and located the requested information, and that Williams Ford had used this information to obtain releases from most of the potential class members. Specifically, out of approximately 150 potential members of Class A identified by Mrs. Williams's investigation, representatives of Williams Ford contacted approximately 121 members of that group and obtained releases from all of them. Similarly, representatives of Williams Ford identified and contacted potential members of Class B and obtained releases from all but seven of that group. In their supplemental response to motion for class certification, also filed on June 3, 1998, Williams Ford asserted that the Fraleys had not satisfied the numerosity and predominance requirements of Ark. R. Civ. P. 23, citing the recently obtained releases.

At the certification hearing on June 4, 1998, Mr. John Ervin, a certified public accountant, testified that he examined all security agreements in the Washington County records for which Williams Ford was the secured party in the months that the Fraleys had their retail transactions with Williams Ford, that is, in the months of May 1991, December 1994, January 1995, and August 1995. He discovered five agreements in December 1994, fifteen in January 1995, and twenty-nine in August 1995. Mr. Ervin testified that he examined the retail installment contracts signed by the Fraleys, and that all customers involved in similar agreements that included the purchase of insurance coverage and that were paid off prior to

maturity would be entitled to a refund of unearned premiums, either by direct refund to the customer, or by a credit to the customer's payoff balance. According to Mr. Ervin, the debtors who come within the purported class definition would be identified from records maintained by the secured party, Williams Ford. In that regard, he understood that Mrs. Williams had identified approximately 150 installment contracts that included the purchase of insurance coverage and that were paid off prior to maturity.

Mrs. Fraley testified that neither she nor her husband was ever informed about any entitlement to an insurance refund until they questioned Mr. Williams in August 1995 about obtaining insurance that would not be financed. According to Mrs. Fraley, Mr. Williams said that Williams Ford generally kept insurance refunds. It was, therefore, her belief that others had been deprived of insurance refunds. Mrs. Fraley further testified about "her commitment to represent those other people out there that have been wronged with regard to insurance refunds," and stated that she understood her obligation as a class representative.

Mrs. Maribelle Williams testified that she began her investigation about three to four weeks before the certification hearing. With regard to proposed Class A, she created a master list of customers for whom insurance refunds were sent to Williams Ford from June 18, 1993 to the present. Mrs. Williams developed this list from lists of refunds that she obtained from two insurance companies (Capitol Life and Accident Insurance Company and Equipment Insurance International, Inc.) and from her review of records maintained by Williams Ford. She then removed the names of any customer who was sent a refund or who signed a waiver, or whose contract was canceled due to repossession. After excluding those customers, approximately 150 customers remained on the master list. Mrs. Williams testified that Williams Ford then contacted the customers whose names remained on the list in order to obtain releases from them. Customers were contacted personally by Mrs. Williams, Mr. Williams, one of their two sons, or Mr. G.C. Watson. All of the customers who were contacted signed releases. As of the hearing date, only twenty-four customers on the master list had not been contacted.

With regard to proposed Class B and the federal TILA claims, Mrs. Williams testified that she reviewed 4,500 to 5,000 files in her

office for the time period of June of 1995 through June 4, 1998. She excluded all transactions where no insurance was purchased or where the insurance information was properly disclosed on the face of the contract. She also excluded any contracts where the purchase of equipment was not for agricultural, business, or commercial purposes, or where the amount financed exceeded $25,000.00. Mrs. Williams estimated that approximately twenty customers remained on the list as putative members of Class B. Representatives of Williams Ford contacted and obtained releases from all but five of those customers. Mrs. Williams confirmed that none of their customers were paid any consideration for signing the releases in favor of Williams Ford.

Based upon the testimony presented at the June 4, 1998 certification hearing, the trial court entered an order on June 16, 1998, that directed Williams Ford and its representatives, including its attorneys, to cease all communications with any putative class members regarding the lawsuit. The trial court placed similar restrictions on the Fraleys and their agents and representatives, including their attorneys. The parties were ordered to file briefs regarding the "appropriateness of and effect on the class certification determination of the defendant's communications with putative class members." The trial court also ordered Williams Ford to respond within ten days to the Fraleys' third set of interrogatories and requests for production "with respect to those documents or information readily available to the defendant by reason of the investigation described in Mrs. Williams['s] testimony." The trial court scheduled another hearing regarding class certification on July 6, 1998.

On July 6, 1998, the certification hearing resumed, at which time the trial court heard arguments on the propriety of Williams Ford's pre-certification contact with potential class members. On July 23, 1998, the trial court denied the motion for class certification, ruling that the Fraleys failed to satisfy the numerosity and predominance requirements of Ark. R. Civ. P. 23. The trial court specifically ruled that there is no prohibition against communications, negotiations, or settlements with proposed class members prior to class certification, and that the communications by Williams Ford with proposed class members were not inappropriate. The June 16, 1998 order prohibiting communications with potential class members was revoked, and Williams Ford was ordered to disclose to the Fraleys the names, addresses, and telephone numbers

of all customers identified in Mrs. Williams's investigation. Finally, the trial court suggested that it would reconsider the issue of class certification if evidence were found by the Fraleys that Williams Ford's communications with potential class members was misleading or that the releases were improperly obtained.

In a motion for reconsideration filed on November 5, 1998, the Fraleys alleged that Williams Ford fraudulently obtained releases from potential class members, and that the potential class was larger than initially revealed by Mrs. Williams. The Fraleys subpoenaed the records of five insurance companies that provided insurance for Williams Ford customers. Based upon information received from two of these companies and the information provided by Williams Ford, the Fraleys asserted that the size of the potential class was at least 429 persons. The Fraleys also contacted some of the potential class members previously contacted by Williams. According to excerpts of deposition testimony given by three of these persons, Williams Ford provided misleading information in obtaining the releases. Specifically, Mr. Donald F. Blount testified that Mr. Don Williams told him that Williams Ford would finance his new transaction if he signed the release, and that he was requiring other customers to sign the releases as a condition to financing or refinancing. According to Mr. Blount, Mr. Williams also said that the release pertained only to the immediate transaction. Mr. Dan A. Gross testified that someone at Williams Ford told him that the lawsuit was about whether or not Williams Ford was offering insurance. Because he had always been offered insurance, Mr. Gross signed the release. Finally, Mr. Ricky Lee Miller testified that at the time he signed the release in May 1998, he understood that if there was anything owed to him, it would be "made right" by Williams Ford. It was only after Mr. Miller was subpoenaed for the deposition, which prompted him to conduct his own investigation and notify Williams Ford that he was entitled to a refund, that Williams Ford credited Mr. Miller's account with some of the unearned premium refunds. At the time of the deposition, Mr. Miller testified that he had still "not been made right for at least two refunds."

An affidavit by Mr. J. Mark Lundy, C.P.A., was also attached to the motion for reconsideration. In his affidavit, Mr. Lundy stated that he reviewed the list of refunds from Capitol Life and Accident Insurance Company from January 1994 until July 1998, and found

233 individuals representing 373 refunds. Mr. Lundy also reviewed the Williams Ford refund register provided by Equipment Insurance International, Inc., for the years 1995, 1996, 1997, and 1998 and found 181 individuals representing 260 refunds. He determined that there were 241 names on either the Capitol Life list or the Equipment Insurance list that were not identified on the list of 188 individuals provided by Williams Ford.

Williams Ford filed a response to the motion for reconsideration on January 28, 1999. In its response, Williams Ford argued that the trial court lost jurisdiction over the matter due to the passage of over one hundred days between the filing of the initial order on July 23, 1998, and the filing of the motion for reconsideration on November 5, 1998. Williams Ford further asserted that the only evidence of any misleading information given to potential class members was the testimony of Mr. Donald Blount. However, Mr. Blount recanted this testimony when he was re-deposed on January 26, 1999. This new testimony by Mr. Blount was attached as an exhibit to the response by Williams Ford, as were the affidavits of Mr. Allen Wallis, Mr. Robert Putnam, Ms. Anita Bowers, and Mr. Wayne Burnett. All of these affiants were customers of Williams Ford who indicated that they did not want to participate in any lawsuit against Williams Ford.

On February 12, 1999, the trial court held a hearing on the motion for reconsideration filed by the Fraleys. At the conclusion of the hearing, the trial court entered an amended order that denied the motion for reconsideration. In that amended order, the trial court found that the Fraleys failed to prove that Williams Ford's communications with potential class members were misleading or that the releases were improperly obtained, and that the Fraleys failed to show newly discovered evidence that could not have been discovered within ninety days or prior to the hearings held in June and July of 1998. The trial court also found that the Fraleys failed to establish predominance, numerosity, or superiority for class-action purposes.

In this appeal, the Fraleys challenge the trial court's denial of class certification in the two separate orders, both of which were based on findings that the proposed class lacked numerosity and that the individual issues predominated over the common issues. In its

second order, the trial court also found that a class action was not a superior method for adjudicating the claims against Williams Ford.

Rule 23 of the Arkansas Rules of Civil Procedure provides that a trial court may certify a class only if the following conditions are met:

> (1) The class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Ark. R. Civ. P. 23(a). Additionally, the court must find that questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Ark. R. Civ. P. 23(b). The determination of whether the elements of Rule 23 have been satisfied is within the broad discretion of the trial court, and we will not reverse absent an abuse of that discretion. *Mega Life & Health Ins. Co. v. Jacola*, 330 Ark. 261, 954 S.W.2d 898 (1997); *Direct Gen. Ins. Co. v. Lane*, 328 Ark. 476, 944 S.W.2d 528 (1997); *Farm Bureau Mutual Ins. Co. v. Farm Bureau Policy Holders & Members*, 323 Ark. 706, 918 S.W.2d 129 (1996); *Cheqnet Sys., Inc. v. Montgomery*, 322 Ark. 742, 911 S.W.2d 956 (1995).

*I. Rule 23(a) Numerosity Requirement*

The first requirement of class certification is "that the class is so numerous that joinder of all members is impractical." Ark. R. Civ. P. 23(a)(1). In *Mega Life & Health Ins. Co. v. Jacola, supra,* we reiterated the parameters for the trial court's inquiry into the numerosity requirement:

> In *Cheqnet Systems, Inc. v. Montgomery*, 322 Ark. 742, 911 S.W.2d 956 (1995), we held that:
>
> > the exact size of the proposed class and the identity of the class members need not be established for the court to certify a class, and the numerosity requirement may be supported by common sense.

We have not adopted a bright-line rule to determine how many class members are required to satisfy the numerosity requirement. *See, e.g. Summons v. Missouri Pac. R.R.*, 306 Ark. 116, 813 S.W.2d 240 (1991)(approving a class of several thousand claimants); *International Union of Elec., Radio, & Mach. Workers v. Hudson*, 295 Ark. 107, 747 S.W.2d 81 (1988)(declaring that "at least several hundred" class members were sufficient); *Cooper Communities, Inc. v. Sarver*, 288 Ark. , 701 S.W.2d 364 (1986) (holding that 184 potential class members were enough); *City of North Little Rock v. Vogelgesang*, 273 Ark. 390, 619 S.W.2d 652 (1981)(rejecting a class of only seventeen potential plaintiffs).

330 Ark. at 269-70, 954 S.W.2d at 901.

In this case, Mrs. Williams's affidavit and testimony at the June 4, 1998 certification hearing indicated that she identified approximately 150 persons who could conceivably be putative class members for Class A and fifteen to twenty persons who might be putative class members for Class B.[1] During the period of three to four weeks prior to the certification hearing, Williams Ford obtained releases from all persons Mrs. Williams identified except for twenty-four persons in Class A and five persons in Class B. Information that was obtained by the Fraleys from two insurance companies identified by Mrs. Williams and then submitted to the trial court with their motion for reconsideration in November, 1998, identified a total of at least 429 persons who might be putative class members for Class A; that is, at least 429 persons financed insurance through Williams Ford, terminated their policies early as a result of some early payoff, and their insurance premium refunds had been returned to Williams Ford.

The trial court found that the numerosity requirement had not been satisfied because many putative class members had released Williams Ford from liability and because the releases were properly obtained by Williams Ford. The Fraleys argue that the trial court abused its discretion when it considered the merits of the case to determine that numerosity was not present. Specifically, they contend that the trial court's findings regarding the affirmative defenses

---

[1] After Williams Ford complied with the trial court's order to produce the list developed by Mrs. Williams, the actual number of persons identified by Mrs. Williams as conceivably falling within the class definition was determined to be 188.

of release and consent were an improper intrusion into the merits of the case at the certification stage. We agree.

We have held that neither the trial court nor the appellate court may delve into the merits of the underlying claim in determining whether the elements of Rule 23 have been satisfied. *Mega Life & Health Ins. Co. v. Jacola, supra; Farm Bureau Mutual Ins. Co. v. Farm Bureau Policy Holders & Members, supra.* In that regard, a trial court may not consider whether the plaintiffs will ultimately prevail, or even whether they have a cause of action. *Mega Life & Health Ins. Co. v. Jacola, supra; Farm Bureau Mutual Ins. Co. v. Farm Bureau Policy Holders & Members, supra.* Thus, the propriety of a class action is "basically a procedural question." *Farm Bureau Mutual Ins. Co. v. Farm Bureau Policy Holders & Members, supra* (citing *Miller v. Mackey International, Inc.*, 452 F.2d 424 (5th Cir. 1971)).

With regard to the issues of release and consent, Rule 8 of the Arkansas Rules of Civil Procedure clearly provides that such issues are affirmative defenses:

> In responding to a complaint, counterclaim, cross-claim, or third party claim, a party shall set forth affirmatively accord and satisfaction . . .estoppel . . .payment, *release* . . . statute of limitations, waiver, and *any other matter constituting an avoidance or affirmative defense.*

Ark. R. Civ. P. 8(c) (1999) (emphasis added). We have not previously addressed the issue of whether certification challenges based on the affirmative defenses of release and consent constitute an impermissible intrusion into the merits of the case. However, we have noted that certification challenges based on the statute of limitations, fraudulent concealment, releases, causation or reliance have usually been rejected and will not bar satisfaction of Rule 23(b)'s predominance requirement. *Seeco, Inc. v. Hales,* 330 Ark. 402, 954 S.W.2d 234 (1997).

Many federal district courts recognize that "consideration of 'affirmative defenses at the class certification stage' is an improper intrusion into the merits of the case." *Kesler v. Hynes & Howes Real Estate, Inc.*, 66 F.R.D. 43 (S.D. Iowa 1975); *see also Gavron v. Blinder Robinson & Co., Inc.*, 115 F.R.D. 318 (E.D. Penn. 1987);*Shankroff v. Advest, Inc.*, 112 F.R.D. 190 (S.D.N.Y. 1986)(holding that the trial court should not determine the merits of some affirmative defense

directed against some putative class members at preliminary certification hearing);*Fickinger v. C.I. Planning Corp.*, 103 F.R.D. 529 (E.D. Pa. 1984); *Neuberger & Berman v. Northern Elec. Co., Ltd.*, 70 F.R.D. 447 (S.D.N.Y. 1975); *Richardson v. Hamilton International Corp.*, 62 F.R.D. 413 (E.D. Pa. 1974). We have said that we will interpret Ark. R. Civ. P. 23 in the same manner the federal courts interpret the comparable Fed. R. Civ. P. 23. *See Farm Bureau Mutual Ins. Co. v. Farm Bureau Policy Holders & Members, supra; Union National Bank v. Barnhart*, 308 Ark. 190, 823 S.W.2d 898 (1992).

▮▮▮ Accordingly, we hold that a trial court should not delve into the merits of affirmative defenses in determining whether the numerosity requirement of Rule 23 (a) has been satisfied at the class-certification stage. In this case, the trial court prematurely adjudicated the validity of the releases when it found that the putative class members had released or consented to Williams Ford's retention of the insurance refunds. We, therefore, conclude that the trial court mistakenly delved into the merits of Williams Ford's affirmative defenses in determining that the numerosity requirement had not been satisfied.

The Fraleys also challenge the trial court's finding that the releases were properly obtained by Williams Ford. Specifically, they contend that Williams Ford improperly obtained the releases by communicating personally with putative class members without prior court approval during the time after the motion for class certification was filed but before the first certification hearing. The Fraleys suggest that Williams Ford's pre-certification communications were improper and presented a likelihood of serious abuses. Accordingly, they urge this court to hold that the trial court abused its discretion in considering releases that were improperly obtained at the certification stage.

The propriety of a defendant's pre-certification contact with potential class members is an issue of first impression for this court. The cases cited by the parties indicate that some federal courts have strictly prohibited such communications. *Rankin v. Board of Education of Unified School Dist. No. 489*, 174 F.R.D. 695 (D. Kan. 1997); *Hampton Hardware, Inc. v. Cotter & Company*, Inc., 156 F.R.D. 630 (N.D. Tex. 1994); *see also, Impervious Paint Industries v. Ashland Oil*, 508 F. Supp. 720 (W.D. Ky. 1981). Other federal courts have allowed such communications with appropriate safeguards. *Weight*

*Watchers of Philadelphia, Inc. v. Weight Watchers Int'l., Inc.*, 455 F.2d 770 (2d Cir. 1972)(court-imposed guidelines); *Vernon J. Rockler & Co. v. Minneapolis Shareholders*, 425 F. Supp. 145 (D. Minn. 1977)(SEC scrutiny of settlement offer). Finally, some courts have allowed unrestricted pre-certification communications without court approval. *Nesenoff v. Muten*, 67 F.R.D. 500 (1974); *Janousky v. Jewel Companies, Inc.*, 538 N.E.2d 689 (Ill. App. 1 Dist. 1989).

The concerns of those courts that prohibit or supervise pre-certification communications have been expressed succinctly by one distinguished treatise, NEWBERG ON CLASS ACTIONS:

> The solicitation of exclusions from a pending class action by a defendant before the court has determined that the case may proceed as a class action constitutes a serious challenge to the authority of the court to have some control over communications with class members. Unauthorized communications in a franchise class action, for example, may result in settlements by so many franchises as to eliminate satisfaction of the numerosity requirement of Rule 23(a)(1), thus stripping the action of its representative status and leaving the plaintiff free only to prosecute her or his own individual claim. Courts are concerned that such communications may prevent class members from making informed decisions about exclusion. "It is the responsibility of the Court as a neutral arbiter, and of the attorneys in their adversary capacity, to insure this type of free and unfettered decision to opt out of the class or not."

1 Herbert B. Newberg, NEWBERG ON CLASS ACTIONS § 15.19 at 15-52 (3rd ed. 1992)(citations omitted).

The case of *Hampton Hardware, Inc., supra,* illustrates the circumstances where pre-certification communications have been found to be improper. After the class-action suit was filed against Cotter & Co., Daniel Cotter, president and CEO of Cotter & Co., sent three letters to potential class members, who were also members of Cotter & Co., a member-owned hardware wholesaler. *Id.* In the first letter, he notified class members about the "enormous potential cost to your Company due to this class action," and then asked class members, "What can you do to avoid this waste of time and money? Decide not to participate in this lawsuit." *Id.* In a second letter, he again told potential class members that "[b]y not participating in this suit, you will save your Company expense in dollars and time." *Id.* Finally, in a third letter, Mr. Cotter stated that

"[b]y asking you to join the class, Hampton is asking you to sue yourself." *Id.* Hampton contended that these contacts were improper and requested an order prohibiting Cotter & Co. from contacting prospective class members concerning the litigation. *Id.*

The *Hampton* court ruled that such communications violated the principles of Rule 23. *Id.* Specifically, the court found that, regardless of the stated purpose of the letters, "any common sense reading of them reveals that they are an attempt to prevent member participation in the class action." *Id.* The court further observed that the relationship between Cotter & Co. and putative class members was relevant in gauging the propriety of the communications:

> The fact that the defendant and potential class members are involved in an on-going business relationship, further underscores the potential for coercion. Members must necessarily rely upon the defendant for dissemination of factual information regarding hardware goods and for lower prices in purchasing those goods. They are therefore particularly susceptible to believing the defendant's comments that the lawsuit will cost them money. Cotter, on the other hand, an interested party in the litigation, faces a conflict of interest in advising members on the merits of participation in the lawsuit due to its direct pecuniary interest in the outcome.

*Id.* The court concluded that an order limiting contacts between defendants and potential class members is justified whenever there is a finding of the likelihood of serious abuses. *Id.* The court also reiterated Rule 23's policy that favors having litigation in which common interests, or common questions of law and fact prevail, disposed of in a single lawsuit. *Id.* Thus, it concluded that the three letters sent by Mr. Cotter worked directly against the interests embodied in Rule 23 by attempting to reduce the class members' participation in the lawsuit. *Id.* Having decided that the contacts were improper, the court then addressed what relief was appropriate in light of the United States Supreme Court's admonishment in *Gulf Oil Co. v. Bernard,* 452 U.S. 89 (1981), that an order limiting class contacts should limit "speech as little as possible consistent with the rights of the parties under the circumstances." *Id.* (citing *Gulf Oil Co. v. Bernard, supra*). In that regard, the district court utilized the following four criteria to frame an appropriate order limiting the type of commercial speech that encouraged potential class members not to join in the suit: the severity and likelihood of the perceived harm; the precision with which the order is drawn;

the availability of a less onerous alternative; and the duration of the order. *Id*. After examining the facts of the case under each of the four criteria, the *Hampton* court held that:

> [T]he order in this case, consistent with the principles in *Gulf Oil*, should prohibit contacts between the defendants and potential class members up through the time of trial. The court supervised notice will provide objective information to potential class members upon which they can base a decision to participate or not participate in this action. Business related communications will, as in the past, continue between Cotter and the class members.

*Id*.

Similarly, in *Kleiner v. First National Bank of Atlanta,* 751 F.2d 1193 (1985), the United States Court of Appeals for the Eleventh Circuit upheld an order prohibiting contacts between defendants and potential class–action plaintiffs. While *Kleiner, supra,* involved unsupervised, unilateral communications after class certification but before the court-supervised notice of the opportunity for exclusion under Fed. R. Civ. P. 23(c)(2), the court found that a systematic campaign of telephone calls by bank personnel to prospective class members was not to alleviate customer confusion, but rather to solicit as many exclusions as possible. *Id*. According to the court, "[u]nsupervised, unilateral communications with the plaintiff class sabotage the goal of informed consent by urging exclusion on the basis of a one-sided presentation of the facts, without opportunity for rebuttal. The damage from misstatements could well be irreparable." *Id*. The Eleventh Circuit Court of Appeals also acknowledged that a unilateral communications scheme is rife with potential for coercion, especially when there is an ongoing business relationship. *Id*. Furthermore, the court concluded that there was inherent coercion when a high number of exclusion requests resulted from such a scheme.[2] *Id*. Finally, the danger of unsupervised oral solicitations was noted:

> The Supreme Court has acknowledged that unsupervised oral solicitations by their very nature are wont to produce distorted statements on the one hand and the coercion of susceptible individuals on the other:

---

[2] First National Bank eventually succeeded in reaching a little over 3000 customers, nearly 2800 of whom decided to exclude themselves. *Kleiner, supra*.

> [I]n person solicitation may exert pressure and often demand an immediate response without providing an opportunity for comparison or reflection. The aim and effect of in-person solicitation may be to provide a one-sided presentation to encourage speedy and perhaps mis-informed decision-making; there is no opportunity for intervention or counter-education. . . .

*Id.* (citing *Ohralik v. Ohio State Bar Ass'n,* 436 U.S. 447 (1978)).

■ In oral argument, the Fraleys urged this court to prohibit all unsupervised, unilateral communications with potential class members prior to certification. We decline to impose the proposed bright-line rule in all class actions, because we cannot say with certainty that such a rule would withstand constitutional scrutiny. *See Gulf Oil Co. v. Bernard, supra.* Likewise, we reject Williams Ford's suggestion that pre-certification communications with potential class members should always be unrestricted. In that regard, we note that mechanisms were already in place to protect against the likelihood of abuse in the federal cases cited by Williams Ford. *Weight Watchers, supra* (court-imposed guidelines); and *Rockler, supra* (SEC scrutiny of settlement offer). Instead, we are persuaded by the reasoning of the federal district court in *Hampton, supra,* that pre-certification communications with potential class members which attempt to substantially reduce member participation in the class action, or which otherwise indicate a likelihood of coercion or a serious potential for harm to the interests of the class action, should be restricted or prohibited when brought to the attention of the trial court. We will, therefore, be guided by these considerations as we examine the circumstances in this particular case to determine whether Williams Ford's pre-certification communications with potential class members were improper.

Our examination of the record in this case reveals the following circumstances surrounding Williams Ford's pre-certification contacts with potential class members:

- Williams Ford began its own internal investigation of potential class members at the same time that it was objecting to parallel discovery requests by the Fraleys.

- The Williams Ford investigation was conducted by Mrs. Williams, who used company records and two lists

obtained from insurance companies to develop a master list for proposed Class A that included the names of 188 customers whose insurance refunds went back to Williams Ford.

- Because Mrs. Williams was not able to determine from the company's records exactly where the insurance refunds for those 188 customers went after they were received by Williams Ford, Williams Ford launched an effort to contact all 188 customers personally.

- According to Mrs. Williams, all of the customers who were contacted, with only a couple of exceptions, confirmed that the insurance refunds were retained by Williams Ford with their consent.[3]

- One hundred percent of the proposed Class A customers who were contacted by Williams Ford signed General Releases of All Claims, which provided in pertinent part that:

> [A]ny insurance premium refund which resulted from the cancellation of my installment contract dated *any date* was released by me to Williams Ford Tractor & Equipment Company as a portion of the consideration for my installment contract dated *any date*.

- Representatives of Williams Ford also contacted and obtained releases from all but five of approximately twenty customers who remained on the list as putative members of proposed Class B. One hundred percent of the proposed Class B customers who were contacted by Williams Ford also signed General Releases of All Claims, which provided in pertinent part that:

> [A]ll information concerning the costs or refunds of insurance under the retail installment contract(s) and security agreement(s) dated *any date* was (were) disclosed to me at the time of sale although the federal

---

[3] As of the hearing on June 4, 1998, only twenty-four customers on the master list had not been contacted.

Truth in Lending disclosure form of said documents omits the specific information.

- At the time representatives of Williams Ford personally contacted the putative class members about signing the releases, all of them were still customers and had credit extensions with Williams Ford.

- The customers were told by Williams Ford representatives about the lawsuit, but they were not told the amount of any refund they would get if they were in the class and the lawsuit was successful. Nor were they told anything about whether they might be entitled to any award of punitive damages. According to Mrs. Williams, "all of them were satisfied that they had been treated fairly and received everything they were to receive."

- With the exception of two or three customers who were paid their refunds and then signed releases, none of the customers who signed releases were paid anything for the releases.

- In Mrs. Williams's words, the purpose of this process was:

 > [T]o show that there is no class of people out there, that each customer and all of his transactions are individual between buyer and seller. I have also wanted to properly document my files.

From this summary of the circumstances surrounding Williams Ford's communications with potential class members, it is clear that the president, secretary, and other representatives of Williams Ford attempted to contact all potential class members prior to class certification. During these direct oral communications with potential class members, Williams Ford's representatives not only attempted to discourage participation in the lawsuit, but also discussed the merits of the case when they attempted to confirm that every customer consented to Williams Ford's retention of the insurance refunds. Furthermore, the potential class members have an ongoing business relationship with Williams Ford. This type of situation is particularly conducive to coercion and undue influence. The fact that all of the potential class members owe Williams Ford money and may depend upon Williams Ford for the financing of future equipment purchases renders them particularly vulnerable to coer-

cion. Moreover, the high number of releases obtained from one hundred percent of the customers contacted by Williams Ford is persuasive evidence that coercion was inherent in the direct personal communications with potential class members.

■ Furthermore, excerpts from the deposition testimony of three potential class members suggest the likelihood of confusing and misleading communications during the course of Williams Ford's efforts to obtain releases from all potential class members. According to Mr. Donald F. Blount, Williams Ford required all customers to sign the release documents as a prerequisite for financing or refinancing. Mr. Blount recanted this testimony after he was re-deposed. Similarly, Mr. Dan A. Gross was reluctant during his deposition to testify against his friend Don Williams, but he did testify clearly that someone at Williams Ford told him that the lawsuit was about whether Williams Ford had offered insurance. He had always been offered insurance, so he signed the release. Mr. Ricky Lee Miller testified that he signed the release after Williams Ford assured him that anything owed to him would be made right. Several months later and just before Mr. Miller's deposition, Williams Ford credited his account with some, but not all, of his unearned premium refunds. Based upon all of these circumstances, we conclude that the pre-certification communications by Williams Ford with potential class members were improper and presented a likelihood of serious abuses. Accordingly, we hold that the trial court's consideration of such communications, including the releases that resulted therefrom, was an abuse of discretion.

■ We stress that our decision is not meant to chill settlement negotiations in any way, and that resolution of litigation prior to trial remains desirable. However, attempts by class opponents to discourage participation in class actions under circumstances that indicate a likelihood of coercion, or a serious potential for harm to the interests of the class action, violate the principles of Rule 23. This proposition is supported by NEWBERG ON CLASS ACTIONS:

> Though the law has long favored settlements, releases from liability or exclusions from a class action obtained by the defendant through misrepresentation or the coercive threat of economic sanctions will not receive judicial approval when challenged.

NEWBERG ON CLASS ACTIONS, *supra*, at § 15.19 at 15-54. Rule 23(c) also provides a mechanism for class members to make

informed decisions about exclusion. Under that provision, a class-certification notice that contains accurate information is sent to each potential class member, who can then make an informed and independent decision to opt out of the class or not.

 In light of our holding that the trial court should not have considered the releases that were improperly obtained by Williams Ford at the certification stage of this case, we must now determine whether the numerosity requirement has been satisfied. The trial court indicated at the certification hearing that whether or not it was appropriate to consider the releases at the certification stage "could well be decisive in this particular case." We agree. According to Mrs. Williams, there are at least 188 potential class members.[4] Furthermore, according to the evidence submitted by the Fraleys at the hearing on their motion for reconsideration, at least 429 persons were identified as potential class members. Where the numerosity question is a close one, the balance should be struck in favor of a finding of numerosity in light of the trial court's option to later decertify. *Evans v. U.S. Pipe & Foundry Co.,* 696 F.2d 925 (11th Cir. 1983); *Foster v. Bechtel Power Corp.,* 89 F.R.D. 624 (E.D. Ark. 1981). For these reasons, we conclude that there was sufficient evidence to satisfy the Rule 23(a) numerosity requirement. We, therefore, hold that there was an abuse of discretion by the trial court when it held otherwise.

## II. Rule 23(b) Predominance Requirement

We must now determine whether the trial court abused its discretion when it found that class certification was improper because the common questions of law or fact did not predominate over the questions affecting only individual members. Specifically, the trial court found that the class certification should be denied based on the individual issues raised by the claim of fraudulent concealment and the defenses of statute of limitations, release, and consent.

 The predominance element can be satisfied if the preliminary, common issues may be resolved before any individual issues. *Mega Life & Health Ins. Co. v. Jacola, supra; International Union Of*

---

[4] It is not clear whether this number includes potential members of Class B.

*Elec., Radio & Mach. Workers v. Hudson,* 295 Ark. 107, 747 S.W.2d 81 (1988). In making this determination, we do not merely compare the number of individual versus common claims. *Mega Life & Health Ins. Co. v. Jacola, supra; Summons v. Missouri Pac. R.R.,* 306 Ark. 116, 813 S.W.2d 240 (1991). Instead, we must decide if the issues common to all plaintiffs "predominate over" the individual issues, which can be resolved during the decertified stage of bifurcated proceedings. *Mega Life & Health Ins. Co. v. Jacola, supra; International Union of Elec., Radio & Mach. Workers v. Hudson, supra.*

In *Seeco, Inc. v. Hales,* 330 Ark. 402, 954 S.W.2d 234 (1997), we held that the predominance factor was satisfied because the common issue of whether the defendant had engaged in a scheme to defraud the plaintiff could be resolved in a class action before decertifying the case for resolution of the individual issues of reliance and diligence. Likewise, in *Mega Life & Health Ins. Co. v. Jacola, supra,* we held that the predominance factor was satisfied because the common issues of what type of insurance policy was issued, and what type of notice was required prior to termination, would be resolved in a class action before decertifying the case for resolution of the individual issues of reliance and damages.

In contrast, we concluded that class certification was improper in *Arthur v. Zearley,* 320 Ark. 273, 895 S.W.2d 928 (1995), because there simply was no common issue, and we recognized in that case that individual issues of informed consent and causation were the essence of the claims of each separate plaintiff. In *Baker v. Wyeth-Ayerst Lab. Div.,* 338 Ark. 242, 992 S.W.2d 797 (1999), we upheld that the trial court's denial of class certification because there were few, if any, global or common issues that could be resolved in the certified stage.

As in *Seeco, Inc. v. Hales, supra,* the issue of a fraudulent scheme is central to the instant case and a common starting point for all class members. The Fraleys' amended complaint alleges a centralized fraudulent scheme in which Williams Ford intentionally converted insurance premium refunds from each member of proposed Class A and failed to disclose information on installment contracts, as prescribed by the federal TILA, to members of proposed Class B. Whether Williams Ford engaged in this alleged conduct is "the overreaching issue which must be the starting point in the resolution of this matter." *Seeco, Inc. v. Hales, supra.* This

common question arises out of standard Retail Installment Contracts and Security Agreements, and Williams Ford's regular business practices with regard to insurance refunds and disclosures required by the TILA, both of which are susceptible to class-wide proof through information that is within the custody of Williams Ford, i.e., the company's books and records maintained in the ordinary course of business. Nor will the individual issues noted by the trial court in its ruling — the statute of limitations, fraudulent concealment, release, and consent — preclude a finding that common issues predominate. *See Seeco, Inc. v. Hales, supra.* For these reasons, we hold, as we did in *Seeco, Inc. v. Hales, supra,* that these challenges will not override the common questions relating to the allegation of a centralized scheme perpetrated by Williams Ford. There was an abuse of discretion by the trial court when it held otherwise.

### III. Rule 23(b) Superiority Requirement

Rule 23(b) further requires that a class action be superior to other available methods for the fair and efficient adjudication of the controversy. This court has held repeatedly that real efficiency can be had if common, predominating questions of law or fact are first decided, with cases then splintering for the trial of individual issues if necessary. *See, e.g., Farm Bureau Mutual Ins. Co. v. Farm Bureau Policy Holders & Members Mutual Ins. Co., supra; Summons v. Missouri Pac. R. R., supra; Lemarco, Inc. v. Wood,* 305 Ark. 1, 804 S.W.2d 724 (1991); *International Union of Elec., Radio & Mach. Workers, supra.*

Moreover, certifying this case as a class action is fair to both sides. *Lemarco, Inc. v. Wood, supra.* As we noted in *Seeco, Inc. v. Hales, supra,* Williams Ford can present evidence of fair dealing with its customers and may prevail on this core issue. It can also present individual defenses to the claims of individual class members, such as the statute of limitations, release, and consent, once the common questions have been determined. *Lemarco, Inc. v. Wood, supra.* This procedure is also fair to the class members because it is more economical to pursue the action as a class instead of individually. *Seeco, Inc. v. Hales, supra; Mega Life & Health Ins. Co. v. Jacola, supra.* Thus, we also conclude that the superiority requirement has

been satisfied. There was an abuse of discretion by the trial court when it held otherwise.

## IV. Reconsideration of Class Certification

Finally, we address the Fraleys' contention that the trial court erroneously applied the finality principles set forth in Ark. R. Civ. P. 59 and 60 to reconsideration of its class-certification decision. We agree.

■ Rule 23 of the Arkansas Rules of Civil Procedure specifically states that "[a]n order under this section may be conditional and it may be altered or amended before the decision on the merits." Ark. R. Civ. P. 23; *See also* NEWBERG ON CLASS ACTIONS, *supra* § 7.47. Class rulings are often reconsidered, and subsequently affirmed, altered, modified, or withdrawn. *Id.*

> [A]lthough the court's initial decision under Rule 23(c)(1) that an action is maintainable on a class basis in fact may be the final resolution of the question, it is not irreversible and may be altered or amended at a later date. This power to change the class certification decision has encouraged many courts to be quite liberal in certifying a class when that decision is made at an early stage, noting that the action always can be decertified or the class description altered if later events suggest that it is appropriate to do so.

WRIGHT, MILLER & KANE: FEDERAL PRACTICE & PROCEDURE 2D§ 1785 at pp. 128-31 (2d Ed. 1986)(citations omitted). "The ability of a court to reconsider its initial class rulings . . . is a vital ingredient in the flexibility of courts to realize the full potential benefits flowing from the judicious use of the class device." NEWBERG ON CLASS ACTIONS, *supra* § 7.47 at pp. 7-146. Class-action certification is necessarily an ongoing process in light of Rule 23's opt-out and decertification provisions.

■ For these reasons, we hold that the finality principles of Rules 59 and 60 of the Arkansas Rules of Civil Procedure do not apply to class rulings under Ark. R. Civ. P. 23 before there is a decision on the merits. Thus, the trial court's reservation of the right to reconsider the certification issue was proper. However, it erroneously applied the finality principles of Ark. R. Civ. P. 59 and 60 to reconsideration of its class-certification decision.

Reversed and remanded.